**Opinion issued May 13, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00539-CV

————————————

**ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC. AND ANGLO-DUTCH (TENGE), LLC, Appellants**

**V.**

**CASE FUNDING NETWORK, LP, 3K PARTNERSHIP, PROSPERITY SETTLEMENT FUNDING, INC., LAWSUIT FINANCIAL, LLC, FUTURE SETTLEMENT FUNDING OF SC, INC., ROBERT M. PRESS, NEW AMSTERDAM CAPITAL PARTNERS, INC., RYAN BROOKS, JOSEPH DINARDO, JOSEPH GIURINTANO, PLAINTIFF SUPPORT SERVICES, INC., ROBERT E. HILL, AND ANZAR SETTLEMENT FUNDING CORP., Appellees**

---

**On Appeal from the 127th District Court**
**Harris County, Texas**
**Trial Court Case No. 2004-23845-A**

---

**O P I N I O N**

Appellants, Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC (collectively, "Anglo-Dutch"), challenge the trial court's March 6, 2012 amended final judgment, entered after a bench trial, in favor of appellees, Prosperity Settlement Funding, Inc. ("Prosperity"), Robert M. Press ("Press"), and Anzar Settlement Funding Corp. ("Anzar") (collectively, "the release investors"), in their suit against Anglo-Dutch for breach of contract and fraudulent inducement to sign releases. In four issues, Anglo-Dutch contends that the trial court erred in denying its plea in abatement and concluding that Prosperity and Anzar had the capacity to bring suit in Texas, there is insufficient evidence to support the trial court's finding that Anglo-Dutch fraudulently induced the release investors to sign release agreements, and the trial court erred in awarding the release investors their attorneys' fees and not awarding Anglo-Dutch its attorneys' fees.

We affirm.

## Background

In 2000, Anglo-Dutch, which is engaged in the oil and gas exploration business, filed a lawsuit against Halliburton Energy Services, Inc. ("Halliburton") and Ramco Oil & Gas, Ltd ("Ramco"),[1] alleging that Halliburton and Ramco

---

[1] The matter was styled *Anglo-Dutch (Tenge) L.L.C., et al. v. Ramco Oil & Gas, Ltd.*, Cause No. 2000-22588, in the 61st Judicial District Court of Harris County.

2

misappropriated Anglo-Dutch's trade secrets and breached confidentiality agreements, which the parties executed during their development of an oil and gas field in Kazakhstan (the "Halliburton lawsuit"). In order to pay the expenses of prosecuting the Halliburton lawsuit, "meet its operating expenses," and "avoid bankruptcy," Anglo-Dutch raised money from thirty-three investors who agreed to finance the Halliburton lawsuit. The investors entered into Claims Investment Agreements (the "investment agreements"), "which required [Anglo-Dutch] to pay [the investors] a certain sum of money from any cash recovery in the suit against Halliburton." With minor investor-specific variations, the investment agreements defined the terms of the parties' relationships and set forth formulas for calculating any returns that the investors would be entitled to receive in the event that Anglo-Dutch obtained a cash recovery in the Halliburton lawsuit.[2] The investment agreements defined the "Investor's Total Return" as the sum of their investment plus "an amount equal to [a specified percentage] of its Investment," plus an amount equal to [a specified percentage of the Investor's Investment for each one year term (using a 365-day year) following (a specified date) and ending on the

---

[2] Although the investment agreements differed in some respects, including the amount of the investment and any return, all of the agreements were similarly structured. Also, although the formula used to calculate the "Investor's Total Return" varied from agreement to agreement, the "driving factor" in determining the pertinent return was the amount of time that had elapsed from the date of investment.

3

date Anglo-Dutch receives its Cash Recovery." After a jury rendered a verdict on October 24, 2003, the district court, in January 2004, entered a judgment against Halliburton and Ramco, awarding Anglo-Dutch damages in the amount of approximately $81 million, including $10 million in attorneys' fees.

On November 30, 2003, in the aftermath of the Halliburton lawsuit,[3] Scott Van Dyke,[4] the president and majority shareholder of both Anglo-Dutch entities, reported to the investors that the district court had ordered the parties to attend

---

[3]    The Halliburton lawsuit and Anglo-Dutch's subsequent settlement with Halliburton has spawned a series of lawsuits and appeals involving the original judgment and the investors who signed the litigation funding agreements, as well as litigation by one of Anglo-Dutch's attorneys regarding attorneys' fees. *See Anglo-Dutch Petroleum Int'l Inc. v. Greenberg Peden, P.C.,* 267 S.W.3d 454 (Tex. App.—Houston [14th Dist.] 2008, pet. granted), *rev'd by*, 352 S.W.3d 445 (Tex. 2011) (attorneys' fees dispute); *Anglo–Dutch Petroleum Int'l, Inc. v. Smith*, 243 S.W.3d 776 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (investor refused reduced payment on investment agreement and sued Anglo-Dutch for fraud, breach of fiduciary duty, conversion and breach of contract); *Anglo–Dutch Petroleum Int'l, Inc. v. Littlemill Ltd*, No. 14–06–00921–CV, 2007 WL 2826900 (Tex. App.—Houston [14th Dist.] Oct. 2, 2007, pet. denied); *Case Funding Network, L.P. v. Anglo–Dutch Petroleum Int'l, Inc.*, 264 S.W.3d 38 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *Anglo–Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Anglo–Dutch's judgment against Ramco was reversed on appeal. *See Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) LLC*, 207 S.W.3d 801 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). Another investor also sued Anglo-Dutch for fraud involving the Tenge Joint Enterprise for the development of the oil and gas field in Kazakhstan. *See Anglo-Dutch Petroleum Int'l, Inc. v. Shore Harbour Capital Mgmt. Corp.*, No. 01-09-00417-CV, 2011 WL 862117 (Tex. App.—Houston [1st Dist.] March 10, 2011, no pet.).

[4]    The release investors alleged in their petition that Van Dyke, as president of Anglo-Dutch, has "acted on [its] behalf at all times in connection with the facts, events and occurrences forming the basis of this lawsuit."

mediation. Anglo-Dutch, Halliburton, and Ramco attended mediation in early December 2003, and Van Dyke told the investors that "[a]t the conclusion of the mediation, Halliburton's and Ramco's offers were too low for us to accept." In a January 21, 2004 email, Van Dyke stated to the investors that despite continued settlement negotiation efforts between Anglo-Dutch and Halliburton, including several face-to-face meetings with the president of Halliburton, John Gibson, "the amount Halliburton is willing to pay to settle the case remains a small fraction of the jury verdict. We have refused to accept their small settlement offer." On April 2, 2004, Van Dyke and Gibson had a meeting, after which they signed a settlement agreement in which Halliburton agreed to pay Anglo-Dutch $51 million in damages. Halliburton and Anglo-Dutch then executed on April 16, 2004 a formal settlement agreement entitled, "Compromise and Settlement Agreement," which Halliburton funded the same day.

On April 12, 2004, Van Dyke, on behalf of Anglo-Dutch, sent a letter to the investors stating that, subsequent to the entry of the final judgment in the Halliburton lawsuit, the Texas Supreme Court had issued an opinion "impact[ing] Anglo-Dutch's position with respect to the appeal process and the settlement of the lawsuit." He also stated that the district court had entered an amended final judgment, "significantly reduc[ing]" the value of the original judgment. Van Dyke represented that "[i]n light of current Texas law, it is Anglo-Dutch's strong desire

5

to settle the Lawsuit. Halliburton is expressing willingness to settle the case at this time, but for a significantly lower amount than what we ever expected." Thus, in order to "achieve a resolution" of the Halliburton lawsuit, he "request[ed] everyone who entered into a Claims Investment Agreement to accept a lower payment" than that prescribed by the investment agreements. Van Dyke set forth proposed payment terms, a specific payout amount (characterized as a "return on investment"), and an annual percentage rate based "on terms being given to everyone."

Van Dyke attached to his letter the proposed settlement and release agreements. He also represented in his April 12 letter that "[m]any of the parties who entered into Claims Investment Agreements have executed their respective Settlement and Releases and returned them to us." The settlement and release agreements provided,

> To induce Anglo-Dutch to accept settlement terms substantially less than Anglo-Dutch had anticipated to receive and/or to help facilitate an early payment between Anglo-Dutch and the defendants in the [Halliburton lawsuit] . . . Investor agrees to accept a lower payment from Anglo-Dutch than what is provided for in the Investment Agreements. . . . All Investment Agreements . . . shall terminate, and, by receiving such money, Investor releases Anglo-Dutch from any and all obligation with respect to the Investment Agreements.

The settlement and release agreements further recited that they were being entered "for good and valuable consideration, the sufficiency of which is hereby acknowledged by both parties," and they set forth a date certain by which Anglo-

6

Dutch would make payment. Only six investors executed the settlement and release agreements, and three of the six are "the release investors." Richard L. Oakes executed the release agreement on behalf of Anzar and returned it on April 7, 2004. Anglo-Dutch then sent to Anzar two checks, which Oakes cashed, in amounts totaling $255,473.61. Prosperity executed the release agreement and returned it to Anglo-Dutch on April 12, 2004. Anglo-Dutch then sent to Prosperity a check for $69,153.35. Press executed the release agreement on April 13, 2004, and Anglo-Dutch sent to Press a check for $59,582.19. The remaining twenty-seven investors refused to sign Anglo-Dutch's April 12, 2004 settlement request.

On April 23, 2004, Anglo-Dutch sent the remaining twenty-seven investors a letter in which it disputed the validity of the investment agreements, asserting that they were "contrary to Texas public policy" and "unenforceable under Texas law." Anglo-Dutch enclosed a check for each of the investors for "less than the amount called for" under their investment agreements. Anglo-Dutch asserted to these investors that by depositing the check, they would be acknowledging an "accord and satisfaction," discharging Anglo-Dutch from further obligation under the investment agreements. The remaining investors all signed and deposited the checks. Ten of these investors (the "accord investors") cashed their checks, but later, along with the release investors, sued Anglo-Dutch.

7

In 2004, thirteen investors, including the ten accord investors and the three release investors, sued Anglo-Dutch for breach of contract, alleging that Anglo-Dutch had failed to pay them in accordance with the investment agreements, and torts stemming from the investment agreements and negotiations related to the investment agreements, including fraud, fraudulent inducement, breach of fiduciary duty, and conversion. Anglo-Dutch counterclaimed for breach of contract, breach of the release agreements, fraud, and it sought to recover its attorneys' fees.

The investors and Anglo-Dutch filed several summary-judgment motions. The investors sought summary judgment on their breach of contract claims. And Anglo-Dutch sought summary judgment, asserting that the investors' claims were barred by the affirmative defenses of release and accord and satisfaction. Anglo-Dutch also asserted that no evidence supported the investors' tort and statutory claims.

On September 22, 2006, the trial court, subject to Anglo-Dutch's affirmative defenses, granted the summary judgment motion of the thirteen investors to recover on their claims that Anglo-Dutch beached the investment agreements. The trial court denied Anglo-Dutch's summary-judgment motion "on grounds related to the contract issues," which included Anglo-Dutch's contention that the investment agreements constituted usurious loans, violated Texas public policy, and

constituted unregistered securities. However, the trial court granted Anglo-Dutch summary judgment against the investors who had cashed Anglo-Dutch's April 22, 2004 checks on the grounds of accord and satisfaction and release. It specifically held that Anglo-Dutch had "established as a matter of law that there was an accord and satisfaction of the underlying debt" between Anglo-Dutch and the accord investors. The trial court further held that the three release investors had "released [Anglo-Dutch] by separate release agreements." Additionally, the trial court granted Anglo-Dutch's no-evidence summary-judgment motion on all of the investors' tort and statutory claims "other than fraud in the inducement." It also granted Van Dyke summary judgment "on all claims." However, the trial court concluded that the release investors had raised a "material issue of fact" as to whether they had been "induced by fraud" to enter into the release agreements. Thus, the trial court denied Anglo-Dutch summary judgment on the release investors' fraudulent-inducement claims.

In sum, the trial court granted Anglo-Dutch and Van Dyke summary judgment against all investors and on all claims, except for the release investors' claims against Anglo-Dutch for fraud in the inducement. In a separate order, the trial court severed the release investors' fraudulent-inducement claim and Anglo-

9

Dutch's counter-claim for breach of contract into the instant lawsuit.[5] The trial court subsequently granted the release investors' matter-of-law and no-evidence motion for summary judgment on Anglo-Dutch's breach-of-contract counterclaims.

After a bench trial conducted between January 4 and 9, 2012, the trial court entered judgment in favor of the release investors' claims for fraud and fraudulent inducement in the execution of the release agreements. The trial court found that Anglo-Dutch had fraudulently induced the release investors to enter into the release agreements, and it awarded damages, including pre-judgment interest to Press in the amount of $76,422.60, Anzar in the amount of $325,100.06, and Prosperity in the amount of $84,211.64. It also awarded the release investors post-judgment interest and attorneys' fees including appellate attorneys' fees.

## Plea in Abatement

In its first issue, Anglo-Dutch argues that two of the release investors, Anzar and Prosperity, do not have the capacity to maintain this suit because they "forfeited their corporate charters prior to trial," were not authorized to do business in Texas, and "refused to remedy the issue." Anglo-Dutch further argues that because Anzar and Prosperity transacted intrastate business in Texas, they were required to register with Texas to maintain their suit. Anglo-Dutch filed a plea in

---

[5] The accord investors did not assert a fraudulent-inducement claim in regard to the accord-and-satisfaction agreements.

abatement, asserting that Anzar and Prosperity were not "valid existing corporate entities in their home state of Nevada" and are not "properly registered to [do] business in the State of Texas."  Anglo-Dutch asked the trial court to abate the lawsuit until Anzar and Prosperity were "properly registered to do business in Texas," or, alternatively, dismiss the lawsuit.  On December 8, 2011, the trial court abated the lawsuit for fifteen days, but it explained during a pre-trial hearing that it had done so merely "to make everyone happy" and because of its concerns for scheduling during the holiday season.

We review a trial court's decision on a plea in abatement for an abuse of discretion.  *Wyatt v. Shaw Plumbing Co.*, 760 S.W.2d 245, 248 (Tex. 1988); *Shutter v. Wells Fargo Bank*, 318 S.W.3d 467, 469–70 (Tex. App.—Dallas 2010, pet. dism'd w.o.j.).  A trial court abuses its discretion when it acts in an unreasonable and arbitrary manner, or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).  As the party challenging capacity, Anglo-Dutch had the burden to prove lack of capacity.  *Christi Bay Temple v. GuideOne Specialty Mut. Ins. Co.*, 330 S.W.3d 251, 253 (Tex. 2010).

The trial court made the following pertinent findings of facts and conclusions of law:

> [1.]   [Anzar] is a Nevada Corporation that ceased doing business in 2004.

11

[2.] Anzar was properly registered to do business in Texas when it was doing business in Texas and has paid all franchise taxes due in Texas when it was doing business in Texas.

[3.] On August 9, 2001, Anzar wire-transferred $75,000 from its bank account with the Nevada State Bank in Nevada to [Anglo-Dutch] pursuant to the terms of the Anzar Claims Investment Agreement.

[4.] On September 21, 2001, Anzar exercised its opinion under the Anzar Claims Investment Agreement by forwarding to [Anglo-Dutch] a $25,000 check drawn on its bank account with the Nevada State Bank in Nevada.

[5.] [Prosperity] is a Nevada corporation.

[6.] Prosperity's business address is located in Greeneville, Tennessee.

[7.] Prosperity has never had any offices, employees, agents or other type of business presence in Texas since its inception.

[8.] Prosperity has never transacted any business in Texas.

[9.] On September 12, 2011, Prosperity wire-transferred $12,500 from its Nevada bank account to [Anglo-Dutch] pursuant to the terms of the First Prosperity Claims Investment Agreement.

[10.] On February 28, 2003, Prosperity wire-transferred $25,000 from its Nevada bank account to [Anglo-Dutch] pursuant to the terms of the Second Prosperity Claims Investment Agreement.

[11.] On August 18, 2003, Prosperity forwarded a check for $2,500 drawn upon its Nevada bank account to [Anglo-Dutch] pursuant to the terms of the Third Prosperity Claims Investment Agreement.

[12.] All of the Claims Investment Agreements that Prosperity signed with [Anglo-Dutch] were transacted in interstate commerce as Prosperity was located in Tennessee and negotiated and signed

all agreements with [Anglo-Dutch] from its offices in Tennessee.

[13.] Prosperity and Anzar are Nevada corporations. Under Nevada law, the administrative revocation of a Nevada corporation's charter does not result in the termination of such corporation or forfeiture of its capacity to sue. Accordingly, Prosperity and Anzar have the capacity to bring and prosecute their lawsuit in this case.

[14.] Section 9.051(b) of the Texas Business Organizations Code ("BOC") only precludes unregistered foreign filing entitles from pursuing Texas litigation if such litigation involves any "cause of action that arises out of the transaction of business in this state."[6] Section 9.251 of the BOC states that "activities that do not constitute transaction of business in this state include: (9) transacting business in interstate commerce."[7] Since the cause of action brought by Prosperity and Anzar constitute transaction business in interstate commerce, they do not arise out of the "transaction of business in this state." Accordingly, Texas law permits Prosperity and Anzar to bring and prosecute their claims in this lawsuit irrespective of whether they are registered to do business in Texas.

[15.] Section 9.001(b) of the BOC provides that "[a] foreign entity described by Subsection (a) must maintain the entity's registration while transacting business in this state."[8] Neither Anzar nor Prosperity is "transacting business in this state" as both entities have ceased doing business in any state. Moreover, Section 9.251 of the BOC provides that "activities that do not constitute transaction of business in this state include: maintaining or defending an action or suit."[9] Accordingly, Texas law permits Prosperity and Anzar to bring

---

[6] TEX. BUS. ORGS. CODE ANN. § 9.051(b) (Vernon 2011).

[7] TEX. BUS. ORGS. CODE ANN. § 9.251 (Vernon 2011).

[8] TEX. BUS. ORGS. CODE ANN. § 9.001(b) (Vernon 2011).

[9] TEX. BUS. ORGS. CODE ANN. § 9.251.

and prosecute their claims in this lawsuit irrespective of whether they are registered to do business in Texas.

[16.] Anzar also has the capacity to bring and prosecute their claims in this litigation because it was registered to do business in Texas when it was transacting business in Texas.

[17.] [Anglo-Dutch has] failed to meet [its] burden to prove that Prosperity and Anzar do not have the capacity to bring and prosecute their claims in this litigation.

[18.] [Anglo-Dutch's] Plea in Abatement is denied.

*Nevada Corporate Status*

Anglo-Dutch argues that Anzar and Prosperity cannot maintain their lawsuit in Texas because their corporate charters were revoked in Nevada, their state of formation, they "ceased to exist" in their home state, and they could not validly obtain a Certificate of Authority to do business in Texas. In order to obtain a Certificate of Authority to do business in Texas, a foreign corporation must exist as a valid foreign-filing entity under the laws of its jurisdiction of formation. *See* TEX. BUS. ORGS. CODE ANN. § 9.004(b)(5). And when a foreign entity ceases to exist in its jurisdiction of organization, it must terminate its registration in Texas. *See* TEX. BUS. ORGS. CODE ANN. § 9.011(a). Anzar was a Nevada corporation and received its corporate charter on March 9, 1999. Prosperity was incorporated in Nevada on July 1, 1999. The Nevada Secretary of State revoked Anzar's corporate charter on April 1, 2007 and Prosperity's corporate charter on August 1, 2008.

14

Under Nevada law, once a corporation is in existence, it is entitled "[t]o sue and be sued in any court of law or equity," and, even after dissolution, a "corporation continues as a body corporate for the purpose of prosecuting and defending suits." NEV. REV. STAT. ANN. §§ 78.060, 78.585 (West 2013). Thus, the date on which a corporation gains the capacity to sue and be sued is that on which it files its articles of incorporation. *See De la Garza v. Clean Oil Innovations, Inc*., No. 4:12-CV-1715, 2013 WL 1222109, at *2 (S.D. Tex. March 20, 2013) (interpreting Nevada statutes). In regard to the penalty for an administrative revocation of a Nevada corporate charter:

> On the first day of the first anniversary of the month following the month in which the filing was required, the charter of the corporation is revoked and the right to transact business is forfeited.

NEV. REV. STAT. ANN. § 78.175(2) (West 2013). Section 78.175 does not provide for the termination of the corporation's existence, nor does it reference a forfeiture of a right to sue or continue the prosecution of ongoing litigation upon revocation.

The Nevada Supreme Court has not addressed the issue of whether the revocation of a corporate charter and the forfeiture of the "right to transact business" includes the right to sue and be sued. However, the court has addressed, in regard to a similar statute, the issue of whether a Nevada limited liability company forfeits the "right to transact business" also forfeits the ability to sue and be sued. *See AA Primo Builders, LLC v. Washington*, 245 P.3d 1190, 1195 (Nev.

15

2010).  The statutory penalties for administrative defaults by Nevada corporations and limited liability companies are identical.  *See* NEV. REV. STAT. ANN. §§ 78.175(2), 86.274(2) (West 2013).  In *AA Primo Builders*, the court reversed a trial court's dismissal of AA Primo's lawsuit that had been pending for three years based upon the administrative revocation of its limited liability company charter. 245 P.3d at 1197.  The supreme court concluded that the forfeiture of the "right to transact business" upon the revocation of a limited liability company's charter does not include the forfeiture of the capacity to sue and be sued.  *Id*. at 1195.

Accordingly, we conclude that under Nevada law, the loss of the capacity to maintain a lawsuit is not among the penalties imposed for the administrative default of a corporation.  Because Anzar and Prosperity did not lose their corporate existence or their ability to sue and be sued, they were still eligible to register as valid foreign-filing entities in Texas and maintain this lawsuit.  *See* TEX. BUS. ORGS. CODE ANN. § 9.004(b)(5).

***Foreign-Filing Entities Maintaining Suit in Texas***

Anglo-Dutch further argues that Anzar and Prosperity lack capacity to maintain this lawsuit because they failed to register to do business in Texas.  In Texas,

> [a] foreign filing entity . . . may not maintain an action, suit, or proceeding in a court of this state, brought either directly by the entity or in the form of a derivative action in the entity's name, on a cause of

16

action that arises out of the transaction of business in this state unless the foreign filing entity is registered in accordance with this chapter.

TEX. BUS. ORGS. CODE ANN. § 9.051(b) (Vernon 2012). However, there are exceptions as to what constitutes the transaction of business in Texas, including the transaction of business in interstate commerce. *See* TEX. BUS. ORGS. CODE ANN. § 9.251(9) (Vernon 2012) ("[f]or purposes of this chapter, activities that do not constitute transaction of business in this state include: transacting business in interstate commerce."); s*ee also Ero Indus., Inc. v. Be-In Buttons Co. of Houston*, 473 S.W.2d 677, 679 (Tex. Civ. App. 1971) (noting certificate of authority or registration is necessary for a foreign corporation to conduct interstate business in Texas or to sue on an intrastate transaction). Here, the trial court concluded that Anzar and Prosperity could maintain their lawsuits in Texas because their claims "do not arise out of the transaction of business in this state."

### *Anzar*

The release investors filed suit in 2004, at which time, the Texas Business Corporations Act provided that "[n]o foreign corporation shall have the right to transact business in this State, until it shall have procured a certificate of authority so to do from the Secretary of State." Act of May 20, 1985, 69th Leg., R.S., ch. 128 § 21, 1983 Tex. Gen. Laws 592, 600 (expired Jan. 1, 2010). Anzar maintained its principal place of business in Texas, and it provided evidence that it had obtained a certificate of authority from the Texas Secretary of State in 2000 and

17

has maintained its registration continuously since that time. The trial court found that "Anzar was properly registered to do business in Texas when it was doing business in Texas and has paid all franchise taxes due in Texas when it was doing business in Texas." Therefore, Anzar did not violate section 9.051 as a foreign-filing entity maintaining a lawsuit in Texas. Accordingly, we hold that the trial court did not err in denying Anglo-Dutch's plea in abatement regarding Anzar.

### *Prosperity*

Prosperity never registered to do business in Texas and did not obtain a certificate of authority. Therefore, Prosperity may only maintain this lawsuit in Texas if it falls under the interstate-commerce exception to section 9.051's requirement that foreign-filing entities register with the state of Texas in order to bring a lawsuit on a cause of action arising out of the transaction of business in Texas. *See Hochmetal Africa, Ltd. v. Metals, Inc.*, 566 S.W.2d 715, 717 (Tex. Civ. App.—Corpus Christi 1978, no writ) (interpreting predecessor to section 9.051 as only forbidding suits on intrastate transactions by corporations that fail to register to do business in Texas); *Ero Indus.*, 473 S.W.2d at 679 (no certificate of authority or registration is necessary for foreign corporation to conduct interstate business in Texas or to sue on interstate transaction).

We examine the transaction at the core of the suit, *i.e.*, the transaction from which the suit arises. *See Terroco Indus. Ltd. v. Am. Home Assur. Co.*, No. 2:07–

18

CV–437, 2009 WL 901488, at *3 (E.D. Tex. Mar. 30, 2009) (examining section 9.251's interstate-commerce exception to section 9.051(b)'s requirement that foreign-filing entity obtain certificate of authority). Here, the investment agreements are the transactions that gave rise to Prosperity's cause of action, and they did not constitute the "transaction of business" in Texas under section 9.251 because they involved interstate commerce.

Prosperity, a Nevada corporation, did not transact any business funding litigation outside of Tennessee except for the investment agreements. Prosperity negotiated and signed its investment agreements in Tennessee, and it wired the money to fund the investment agreements from bank accounts held in Nevada. And all of the communications directed to Prosperity were directed to and received by it in its office in Tennessee. In fact, Van Dyke and Mary Khalilian-Reese, the owner of Prosperity, never met in person before the trial of Prosperity's fraudulent inducement claims.

We conclude that Anglo-Dutch has not met its burden to show that Prosperity transacted intrastate business in Texas. *See Hochmetal*, 566 S.W.2d at 716–17 (concluding that plaintiff's purchase of scrap metal from defendants was not transaction in intrastate commerce). The business that Prosperity transacted in Texas was solely through interstate commerce. *See Rylander v. Bandag Licensing Corp*, 18 S.W.3d 296, 298 (Tex. App.—Austin 2000, pet. denied) (analyzing

19

article 8.01 of Texas Business Corporations Act, predecessor to section 9.251, and concluding Bandag conducted business in Texas solely through interstate commerce as it had no real or tangible personal property in Texas, had no employees in Texas, had no franchises in Texas, and did not distribute goods or services in Texas).

Anglo-Dutch argues that Prosperity conducted interstate commerce in Texas because the investment agreements funded a lawsuit in Texas. However, even when the subject matter of a contract is in Texas, courts look to the transaction itself and whether the transaction occurred "entirely within one state." *Terroco Indus.*, 2009 WL 901488 at *3; *see Guardian Underwriters Reassurance Ltd. v. Thompson, Coe, Cousins & Irons, LLP*, No. Civ. 303CV0133H, 2003 WL 22077945, at *3 (N.D. Tex. Sept. 2, 2003) (concluding that fact that insurance policies were sold in Texas did not transform transaction involving interstate "risk" into an intrastate transaction); *Killian v. Trans Union Leasing Corp.*, 657 S.W.2d 189, 191 (Tex. App.—San Antonio 1983, pet. ref'd n.r.e.) (concluding that transaction constituted interstate commerce as lease agreement was entered into with Illinois leasing company, payments were made in Illinois, and Illinois leasing company had no agency relationship with company that installed equipment in Texas for use in Texas); *Mehaffey v. Barrett Mobile Home Transp., Inc*., 473 S.W.2d 643, 647 (Tex. Civ. App.—Fort Worth 1971, no writ) (concluding that

20

contract to transport mobile home from North Dakota for delivery in Texas was transaction in interstate commerce).

Here, the transactions between Prosperity and Anglo-Dutch were conducted in interstate commerce, and it was not necessary for Prosperity to register to do business in Texas. Accordingly, we hold that the trial court did not err in denying Anglo-Dutch's plea in abatement regarding Prosperity.

We overrule Anglo-Dutch's first issue.

## Fraudulent Inducement

In its third issue, Anglo-Dutch argues that the trial court erred in finding that it fraudulently induced the release investors to sign the release agreements because it had refused to disclose the proposed settlement amount of the Halliburton lawsuit to the release investors and, thus, the release investors "could not have relied on this lack of information "to their detriment." Anglo-Dutch further argues that the release investors' claim for fraudulent inducement fails because it "made no actionable affirmative misrepresentations" to them, they "did not rely on any misrepresentation in executing the releases," and they ratified the release agreements and waived any right to damages.[10]

---

[10]    Although Anglo-Dutch cites to the standard of review for factual sufficiency and asserts in its post-submission brief that it has made a factual-sufficiency challenge, all of its arguments relate to the legal sufficiency of the evidence. Accordingly, we address its challenge to the legal sufficiency of the evidence supporting the trial court's findings.

## *Standard of Review*

In an appeal of a judgment rendered after a nonjury trial, a trial court's findings of fact have the same weight as a jury's verdict, and we review the legal sufficiency of the evidence used to support them just as we would review a jury's findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). In conducting a legal-sufficiency review of the evidence, we must consider all of the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). In determining whether legally-sufficient evidence supports the finding under review, we must consider evidence favorable to the finding, if a reasonable fact finder could consider it, and disregard evidence contrary to the finding, unless a reasonable fact finder could not disregard it. *Id.* at 827. When a party attacks the legal sufficiency of an adverse finding on which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Bellino v. Comm'n for Lawyer Discipline*, 124 S.W.3d 380, 385 (Tex. App.—Dallas 2003, pet. denied). We will sustain a legal-sufficiency or "no evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a

scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810.

We review a trial court's conclusions of law de novo, and we will uphold the conclusions if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Although a trial court's conclusions of law may not be challenged for factual sufficiency, we may review the legal conclusions drawn from the facts to determine whether the conclusions are correct. *Id.* If we determine that a conclusion of law is erroneous, but the trial court nevertheless rendered the proper judgment, the error does not require reversal. *Id.* Finally, we note that the trial court acts as fact finder in a bench trial and is the sole judge of the credibility of witnesses. *HTS Servs., Inc. v. Hallwood Realty Partners, L.P*., 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). "We may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence." *Rich v. Olah*, 274 S.W.3d 878, 884 (Tex. App.—Dallas 2008, no pet.).

*Fraudulent Inducement by Affirmative Misrepresentation*

To prevail on a claim for fraudulent inducement, a plaintiff must establish that (1) the defendant made a false material misrepresentation with knowledge that it was false when made or that the defendant asserted without knowledge of its

23

truth or falsity, (2) the defendant intended the misrepresentation to be acted on, (3) the plaintiff relied on the misrepresentation, and (4) the misrepresentation caused injury. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998); *Gulf Liquids New River Project, LLC, Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 72 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "As a rule, a party is not bound by a contract procured by fraud." *Formosa Plastics*, 960 S.W.2d at 46. "The law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it." *Id.* (quoting *Bates v. Southgate*, 308 Mass. 170, 182, 31 N.E.2d 551, 558 (1941)). Fraudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. *Haase v. Glazner*, 62 S.W.3d 795, 796 (Tex. 2001) (holding that "plaintiff cannot assert a fraudulent inducement claim in the absence of a contract"); *Clark v. Power Mktg. Direct, Inc.*, 192 S.W.3d 796, 799 (Tex. App.—Houston [1st Dist.] 2006, no pet.). In other words, with a fraudulent-inducement claim, the elements of fraud must be established as they relate to an agreement between the parties. *Haase*, 62 S.W.3d at 798–99.

A representation, even if actually true, is actionable if it is used to create an impression substantially false. *Blanton v. Sherman Compress Co.*, 256 S.W.2d 884 (Tex. Civ. App.—Dallas 1953, no writ). A false representation may consist of a

deceptive answer to a question or any other indirect but misleading language. *Reservoir Systems, Inc. v. TGS-NOPEC Geophysical Co., L.P.*, 335 S.W.3d 297, 306 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

*Affirmative Misrepresentations*

Although Anglo-Dutch asserts that it made no actionable affirmative misrepresentations, the record reveals legally-sufficient evidence that it did. In regard to Prosperity and Robert Press, Anglo-Dutch, on April 12, 2004, sent to Press and Mary Khalilian-Reese letters with an enclosed release agreement. The letters were identical with only minor differences relating to the specific amount that each would receive upon execution of the release. Press testified that he received the April 12 letter via email and met with Van Dyke at his office later that day. Although Van Dyke stated in the letter that "many" investors had already signed a release, Van Dyke, at his meeting with Press, told Press that "all" of the investors had signed a release except for Press and Press was the "last person that he had to get this agreement from." Press also testified that Van Dyke had previously stated via email in January 2004 that they were in negotiations with Halliburton, but Halliburton's offer had been "very small." In deciding to execute the release, Press stated that he relied on Van Dyke's representations. Khalilian-Reese testified that she did not have any conversations with Van Dyke at the time, so the only representations he made to her were those contained within his April 12

25

letter. In deciding to execute the release, Khalilian-Reese stated that she relied on

Van Dyke's representations made in the letter.

In the April 12, 2004 letter, Van Dyke made the following affirmative

statements:

[1.] Subsequent to the entry of the Final Judgment, [in the Halliburton lawsuit] on January 30, 2004, the Texas Supreme Court decided *Kerr-McGee Corporation v. Helton*, 2004 WL 22458 (Tex.),[11] a case which has impacted Anglo-Dutch's position with respect to the appeal[] process and the settlement of the Lawsuit. As you are aware, on April 1, 2004, Judge Donovan signed an "Amended Final Judgment" which significantly reduced the value of our judgment.

[2.] In light of current Texas law, it is Anglo-Dutch's strong desire to settle the Lawsuit.

[3.] Halliburton is expressing willingness to settle the case at this time, but for a significantly lower amount than what we ever expected.

[4.] To achieve a resolution of the Lawsuit with Halliburton, Anglo-Dutch is respectfully requesting everyone who entered into a Claims Investment Agreement to accept a lower payment than what is set forth in their Claims Investment Agreement(s).

[5.] Many of the parties who entered into Claims Investment Agreements have executed their respective Settlement & Release and have returned them to us. Since time is of the essence, we need you to please execute the attached Settlement & Release and return it by fax to us by tomorrow, April 13, 2004 by 12 noon Houston time.

In regard to Anzar, Oakes testified that before he received and signed the

release agreement on April 6, 2004, he had had two conversations with Van Dyke.

---

11    *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245 (Tex. 2004).

And Van Dyke testified that he "may very well" have told Oakes that "in light of current Texas law," it was Anglo-Dutch's strong desire to settle the Halliburton lawsuit and he did tell Oakes that it was a "risk that concerned [him]." Oakes noted that, in a telephone conversation that occurred before he signed the release agreement, Van Dyke told him that if the investors did not sign the release, the case would go to the Texas Supreme Court, which had thrown out a similar case in which the plaintiffs could not "re-try" their case. Van Dyke also told Oakes that the expert-witness testimony in both the Halliburton lawsuit and the *Kerr-McGee* case was "virtually identical" and the court had disallowed it because the "expert witness [in *Kerr-McGee* did not] testify in a manner consistent with legal code." Van Dyke further told Oakes that he was the "last person to sign," "everybody else had signed but [him]," and, if he did not sign the release, the Halliburton lawsuit would be appealed and "thrown out" because Halliburton would not settle the case. When Van Dyke telephoned Oakes a second time, he urged Oakes to sign the release, stating that "[he] would [not] get any money and no one else would either."[12] Oakes further testified that in deciding to execute the release, he relied on the representations made to him by Van Dyke.

---

[12]     Van Dyke denied telling Oakes that he was the last person to sign.

*Representations Regarding the Kerr-McGee Opinion*

Anglo-Dutch argues that Van Dyke's oral and written statements to the release investors about the Texas Supreme Court's opinion in *Kerr-McGee Corp. v. Helton*, and the impact that it had on Anglo-Dutch's position in the Halliburton lawsuit, does not constitute actionable fraud because his statements were merely predictions or statements about a future event. Alternatively, Anglo-Dutch asserts that the statements concerned a point of law and are not actionable without Van Dyke having a special knowledge of the law that took advantage of the release investors' ignorance of the law.

Van Dyke's statements regarding the *Kerr-McGee* opinion were intertwined with his statements about the settlement process, which had been going on since December 2003, and the possible appeal of the Halliburton lawsuit. Van Dyke testified that his intent in writing the April 12 letter was to get the investors to take action and sign the release agreements based on his statements. By the time that Van Dyke sent the April 12 letter to Press and Khalilian-Reese, he had already signed what he believed to be a valid settlement agreement with Halliburton to pay Anglo-Dutch $51 million, eighty-percent of the trial court's judgment. Van Dyke also testified that he, on April 2, 2004, believed that by signing an agreement with the president of Halliburton, John Gibson, he was "locking down" Halliburton to

28

the settlement and payment of $51 million so that it could not withdraw, as it had previously withdrawn, a settlement offer of $64 million in January 2004.

To the extent that Van Dyke's statement about the *Kerr-McGee* opinion constituted a prediction about an appeal in the Halliburton lawsuit, it was not actionable. *See Allen v. Devon Energy Holdings, LLC*, 367 S.W.3d 355, 374–75 (Tex. App.—Houston [1st Dist.] 2012, pet. granted, judgm't vacated w.r.m.). However, to the extent that Van Dyke's statement about the *Kerr-McGee* opinion constituted a statement about the settlement of the Halliburton lawsuit and Anglo-Dutch's desire to settle, we hold it was an actionable affirmative misrepresentation because it was made with the intent to induce the release investors to sign the release agreement and accept less money than they were contractually entitled to receive.

Indeed, Van Dyke told Oakes that if he did not sign the release, the Halliburton lawsuit would not be settled but would be appealed to the Texas Supreme Court. Likewise, Van Dyke stated in his April 12 letter to Press and Khalilian-Reese that the *Kerr-McGee* opinion impacted Anglo-Dutch's settlement position and, because of the *Kerr-McGee* opinion, it was Anglo-Dutch's "strong desire" to settle the Halliburton lawsuit. The falsity of Van Dyke's statements is evidenced by the fact that he had already entered into a settlement agreement with Halliburton on April 2, 2004, and he believed the settlement agreement committed

29

Halliburton to pay Anglo-Dutch $51 million. In fact, at the time that Van Dyke spoke to Oakes, sent his April 12 letter to Press and Khalilian-Reese, and spoke to Press at his office, the *Kerr-McGee* opinion could not have impacted Anglo-Dutch's settlement with Halliburton or caused it to have a "strong desire" to settle with Halliburton. Anglo-Dutch, as per Van Dyke, had already settled the Halliburton lawsuit.

*Representations That Releases Necessary for Settlement and Many or All of the Investors Had Signed and Returned the Release*

Van Dyke's representation to Press and Prosperity that "many" or "all" of the investors had signed the release agreements as of April 12, 2004 was objectively false. In fact, when Van Dyke sent the April 12 letter to Press and Prosperity, only four of the thirty-three investors had signed the release agreements. When Van Dyke told Richard Oakes of Anzar that he was the "last one" to sign the release and all the other investors had already returned their signed release, only three investors of the thirty-three had actually done so. Van Dyke acknowledged in his testimony that the "vast majority" of the investors had never signed the release agreements, but he denied telling Press, or anyone, that he, or they, were the "last" to sign the release.

Regardless, Van Dyke testified, and Anglo-Dutch asserts on appeal, that four of the thirty-three investors, representing twelve percent of the investors "certainly constitutes 'many'" of the investors, making the statement "true." The word

30

"many" is defined as a "great indefinite number." IX OXFORD ENGLISH DICTIONARY 345 (2nd Ed. 1991). Four out of thirty-three does not constitute a great number of the investors.

Press further testified that Van Dyke told him that a settlement with Halliburton was "contingent upon me [or] no one would get anything." In other words, Anglo-Dutch would not be able to settle unless all of the investors agreed to sign the release agreements and take less money. Likewise, Oakes testified that Van Dyke told him that if he did not sign the release, Anglo-Dutch would not be able to settle the Halliburton lawsuit, it would be appealed to the Texas Supreme Court, and "no one" would get their money.

Van Dyke's statements to Press and Prosperity and Oakes could not be true because Anglo-Dutch had already entered into a settlement agreement with Halliburton. Accordingly, we hold that Van Dyke's statements that the releases were necessary for settlement and "many" or "all" of the other investors had signed the release, constitute actionable affirmative misrepresentations.

### *Reliance*

Anglo-Dutch next argues that even if Van Dyke's statements about the *Kerr-McGee* opinion and that "many" or "all" investors had already signed and returned the release agreements constitute actionable affirmative misrepresentations,

31

Khalilian-Reese of Prosperity, Robert Press, and Richard Oakes of Anzar did not rely on them.

First, Anglo-Dutch asserts that Khalilian-Reese only relied on the language of the release agreement in making her decision to sign it and nothing else. However, Khalilian-Reese testified by deposition that she relied on the representations made in Van Dyke's April 12, 2004 letter. Specifically, she noted that she relied on his statement that "many others" had executed and returned the release agreements, his statements about the *Kerr-McGee* opinion, and the "sense of urgency" that he conveyed in his letter by requesting return of the signed release agreement by noon the next day.

Second, Anglo-Dutch asserts that Press did not rely on Van Dyke's statement that Press was the last investor who needed to sign the release agreement. However, Press testified that he relied on Van Dyke's statements when he made the decision to sign the release agreement. And Press noted that he did not speak to his daughter and son-in-law who owned a litigation funding company that had also invested in the Halliburton lawsuit, which Anglo-Dutch asserts would have given him actual knowledge that he was not the last investor to sign the release agreement.

Finally, Anglo-Dutch asserts that Oakes did not rely on Van Dyke's statements. Oakes testified that he did rely on the statements made to him by Van

Dyke in their telephone conversations. And Van Dyke admitted that he intended that the investors take action and sign the release agreements based on his statements, representations made in personal conversations, and his April 12, 2004 letter. However, as Anglo-Dutch points out, Oakes testified that after signing the release agreement, but before cashing the check, he spoke to another investor, Bob Hill, and learned that Hill had not signed the release agreement. Oakes also participated in the last portion of a telephone conference call among the investors sometime after Van Dyke had sent his April 23, 2004 "accord and satisfaction" letter. During the call, the investors discussed suing Anglo-Dutch based on possible fraud committed by Van Dyke. For purposes of a fraud claim, a party's reliance on a representation is not justified when the party has actual knowledge of the representation's falsity at the time of alleged reliance. *See Allen*, 367 S.W.3d at 387. Therefore, Van-Dyke's statement to Oakes that he was the "last" one to sign the release agreement is not a basis for an actionable claim by Anzar because Oakes obtained actual knowledge of the truth that he was not the last investor to sign the release agreement. Regardless, Oakes testified that he relied on other statements made to him by Van Dyke.

Accordingly, we hold that the evidence is legally sufficient to support the trial court's finding that the release investors relied on the affirmative representations of Van Dyke in deciding to execute the release agreements.

33

*Ratification and Waiver*

Anglo-Dutch next argues that the release investors' claims for fraudulent inducement fail because there is no evidence to support the trial court's findings that the release investors did not ratify and waive their claims. Here, the trial court specifically found:

> None of Mr. Press, Prosperity or Anzar had or clearly manifested any intention of abiding by their respective releases or of waiving any or all rights to recover for [Anglo-Dutch's] fraud or deception.

> None of Mr. Press, Prosperity or Anzar ratified [Anglo-Dutch's] fraud and deception or waived their rights to pursue their claims in this case.

Anglo-Dutch argues that Oakes ratified the release agreement because he had actual knowledge of the falsity of Van Dyke's statement that he was the "last" investor to sign the release agreement and still cashed the check that Anglo-Dutch had sent to him. However, the record reveals that Oakes had only actual knowledge of one of Van Dyke's misrepresentations, specifically that Oakes had knowledge that he was not the "last" investor to sign. Van Dyke also misrepresented to Oakes that (1) the *Kerr-McGee* opinion impacted the possibility of settlement with Halliburton and (2) Van Dyke strongly desired to settle with Halliburton when, in fact, the settlement had already occurred. Oakes did not have any actual knowledge relating to these misrepresentations.

The release investors argue that Anglo-Dutch's affirmative defenses of ratification and waiver are barred by res judicata because "all claims and defenses asserted by the parties in the original case were disposed of by the Amended Partial Summary Judgment" in 2006. In their original summary-judgment motion on their breach-of-contract claims, the release investors' grounds for summary judgment included their entitlement to summary judgment as a matter of law on Anglo-Dutch's defense of waiver. The trial court granted the release investors partial summary judgment and permitted them to recover on the contracts, subject only to Anglo-Dutch's defense of release. The trial court's order was made final and appealable after the parties filed an Agreed Motion to Sever and Stay. Anglo-Dutch did not appeal the summary judgment granted in favor of the release investors on its defense of waiver. *See Case Funding Network*, 264 S.W.3d at 42. Thus, the issue of waiver was litigated and resolved in the release investors' favor in the first suit. The release investors also argue that Anglo-Dutch could have asserted its ratification defense in the first suit because the evidence upon which Anglo-Dutch relies in its ratification defense in the severed suit, consisting of Richard Oakes's deposition testimony, was available twelve months before the trial court granted the severance.

Anglo-Dutch argues that res judicata does not apply because it never raised these defenses in the underlying litigation between it and the investors and it first

raised res judicata as a defense in a supplemental answer to the release investors' claim for fraudulent inducement. However, even assuming that res judicata does not bar Anglo-Dutch's defenses of ratification and waiver, it has not shown that there is no evidence to support the trial court's specific findings.

Anglo-Dutch first argues that Richard Oakes ratified the release agreement because he obtained knowledge that he was not the "last" investor to sign the release because there was at least one other investor, Bob Hill, who had not signed it. It asserts that Oakes, by listening in on the last portion of a telephone conference call among investors discussing possible fraud committed by Anglo-Dutch and a lawsuit concerning the investment agreements, learned of the fraud and, thus, ratified the release agreement by later cashing his settlement checks. Whether Oakes obtained actual knowledge that one of Van Dyke's misrepresentations was false does not address the fact that Van Dyke also made other misrepresentations to Oakes. Additionally, the trial court made it clear that it did not believe Van Dyke's testimony and found him not at all credible. Anglo-Dutch has not conclusively established that the release investors ratified the release agreements and waived their right to recover damages on their claims for fraudulent inducement. Accordingly, we hold that the evidence is legally sufficient to support the trial court's findings that the release investors did not ratify the release agreements and waive their rights.

Having held that the evidence is legally sufficient to support the trial court's findings that Anglo-Dutch made actionable affirmative misrepresentations to the release investors with the intent to induce them into signing the release agreements, the release investors relied on the misrepresentations, and the release investors did not ratify the release agreements and waive their rights to recover damages, we further hold that the trial court did not err in entering judgment in favor of the release investors on their claims against Anglo-Dutch for fraudulent inducement. We overrule Anglo-Dutch's third issue.[13]

### Attorneys' Fees

In its fourth issue, Anglo-Dutch argues that the trial court erred in awarding the release investors their attorneys' fees because their claims were not for breach of contract, but claims for fraud and fraudulent inducement, their attorneys did not segregate their fees, and, in any event, they are not entitled to attorneys' fees after September 22, 2006 when the trial court entered its Amended Partial Summary Judgment severing the release investors' claims for fraudulent inducement. The release investors argue in response that they are entitled to attorneys' fees because they "were awarded actual contractual damages" for Anglo-Dutch's breach of the

---

[13] Because we have held that the evidence is legally sufficient to support the trial court's findings that Anglo-Dutch made actionable affirmative misrepresentations to the release investors, we need not address its second issue in which it contends that the trial court erred in finding that it had a fiduciary relationship with the release investors.

investment agreements. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 2008).

The release investors pleaded for an award of attorneys' fees and offered expert testimony regarding those fees. And the trial court concluded that:

> [a]ll claims asserted by [the release investors] in this case are breach of contract claims. Accordingly, [the release investors] have no obligation to segregate attorneys' fees between or among claims for which attorneys' fees are recoverable.

In its Amended Partial Summary Judgment, the trial court resolved most of the elements of the release investors' claims for breach of the investment agreements, and it provided for further proceedings on the remaining elements. In its order, the trial court stated:

> A contested material issue of fact has been raised by [the release investors that the release agreements] were induced by fraud for which there is the remedy of enforcement of each successful [release investor's] original contract.
>
> As to each [release investor] who prevails as to his or its fraud in the inducement claim to set aside the release agreements, each [release investor's] damages are liquidated and subject to calculation as a matter of law.
>
> In such event, a prevailing [release investor] is entitled to recover attorney's fees; and
>
> The amount of each [release investors] reasonable attorney's fees is a contested fact issue at this time.
>
> It is therefore ORDERED ADJUDGED and DECREED that partial summary judgment is granted [Anglo-Dutch] against all [investors], subject to the claims of fraud in the inducement of the release

agreements as to three [release investors], and is granted Scott Van Dyke on all claims.

At the time of trial, jury questions will be submitted as to the fraud in the inducement, and, conditioned on a fact finding in the [release investors'] favor, the amount of reasonable attorney's fees. In order to liquidate any damages that would result from affirmative findings for the [release investors], the summary judgment evidence on file and further argument of counsel will be used by the Court to calculate the amount of damages under the original [investment agreements] between the [release investors] and [Anglo-Dutch].

The release investors sought summary judgment on their claims against Anglo-Dutch for its breach of the investment agreement and on Anglo-Dutch's affirmative defense of release on the ground that they were fraudulently induced to sign the release agreements. The release investors did not seek summary judgment on their claims for fraudulent inducement. The trial court, in its Amended Partial Summary Judgment, provided that the release investors could recover on their investment agreements with Anglo-Dutch, subject only to Anglo-Dutch's affirmative defense of release. The trial court also provided that each release agreement would be enforced unless its release investor proved fraudulent inducement. We affirmed the Amended Partial Summary Judgment in *Case Funding*, 264 S.W.3d at 42. Moreover, in its Order of Severance, the trial court describes and refers to the release investors' severed claims as breach-of-contract claims. The release investors asserted several affirmative defenses to the enforceability of the release agreements, including fraud and fraudulent

inducement, and they lost on each defense except fraudulent inducement. Thus, the release investors were able to enforce their original investment agreements with Anglo-Dutch by proving that they were fraudulently induced into signing the release agreements. Accordingly, we hold that the trial court did not err in concluding that the release investors' claims are for breach of contract and they are entitled to attorneys' fees as the prevailing party. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8).

The Texas Supreme Court has articulated the test to determine if attorneys' fees must be segregated as follows:

> [I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.

*Tony Gullo Motors I, L.L.P. v. Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006). In regard to segregation of attorneys' fees, the trial court made the following relevant conclusions of law:

> All discrete legal services performed by [the release investors'] counsel in this case advance and have advanced each [release investors'] breach of contract claims asserted in this case.

> All legal services performed by [the release investors'] lawyers in this case have been necessary to prosecute [the release investors'] claims in this case.

> All claims asserted by [the release investors] in this case are breach of contract claims. Accordingly, [the release investors] have no obligation to segregate attorneys' fees between or among claims for which attorneys' fees are recoverable and claims for which attorneys' fees are unrecoverable.

The release investors offered testimony that all of their attorneys' fees were attributable to and advanced their claims for Anglo-Dutch's breach of the investment agreement. Fred Hagans, the attorney for the release investors, testified that their attorneys' fees related only to work performed after the trial court's severance of the release investors' claims relating to their defense of fraudulent inducement in the signing of the release agreements. Counsel for Anglo-Dutch questioned Hagans concerning the segregation of fees, and Hagans explained that the fees had not been segregated because "all of the work that was done was in connection with the fraudulent inducement defense, which is part of the contract claim. So I have not done any segregation to apply it to anything other than contract, because that's all that's left, as I understand it, after reviewing" the trial court's order. Hagans further noted that the attorney work performed generally advanced the claims of all of the investors. The release investors did seek attorneys' fees related to defending against Anglo-Dutch's counterclaims. However, to prove their entitlement to recover for Anglo-Dutch's breach of the investment agreements, the release investors had to overcome Anglo-Dutch's counterclaims. Attorneys' fees incurred to defeat a counterclaim that must be

overcome to recover fully on a contract need not be segregated. *Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007) (holding that fees incurred in successfully defending against counterclaim in order to collect full amount of note need not be segregated).

Accordingly, we hold that the trial court did not err in concluding that the release investors were not required to present evidence of segregated attorneys' fees and awarding the release investors their attorneys' fees.

We overrule Anglo-Dutch's fourth issue.

## Anglo-Dutch's Attorneys' Fees

In its fifth issue, Anglo-Dutch argues that the trial court erred in granting summary judgment for the thirteen investors on its counterclaim for breach of contract, because their filing of the instant lawsuit for breach of the investment agreements constitutes "some evidence" of their breach of the release agreements and the accord and satisfaction agreements. Thus, Anglo-Dutch asserts that it is entitled to recover its attorneys' fees incurred in defending against the investors' claims.

Unless expressly provided for by statute or contract, attorneys' fees incurred as a result of the defense or prosecution of a lawsuit are generally not recoverable. *Turner v. Turner*, 385 S.W.2d 230, 233 (Tex. 1964). However, equitable principles allow the recovery of such fees as actual damages when a party is

required to prosecute or defend a prior legal action as a consequence of a wrongful act of an opposing party. *See id.* at 234. For this equitable exception to apply, the plaintiff must have incurred the attorneys' fees in a prior action, which must have involved a third party. *Id.* These two prerequisites are not present here. The attorneys' fees that Anglo-Dutch seeks are those that were incurred in the instant case. Moreover, Anglo-Dutch did not provide summary-judgment evidence to raise a fact issue in regard to attorneys' fees as actual damages. Consequently, Anglo-Dutch has provided no evidence that any incurred attorneys' fees were reasonable and necessary. *Id.*

We overrule Anglo-Dutch's fifth issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Sharp, and Brown.