

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00401-CV

_____

JOE GRISEL, DAVID MORRISON, HMCRT, LLC, ENVISAGE CAPITAL, LLC, CYNDEX SERVICES, LLC, WANDA J. BARRERAS, AND C-7 DEVELOPMENT PARTNERS, LLC, Appellants

V.

EVEREST INTERNATIONAL, LLC, Appellee

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-282711-15

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Appellee Everest International, LLC supplied Creative Essentials, LLC (CE) with LapDesk products that CE sold to retailers. When CE started experiencing financial trouble, it brought in business consultant appellant Joe Grisel and his company, appellant HMCRT, LLC, to help save CE. Grisel eventually involved other appellants in the project: David Morrison; Envisage Capital, LLC; Cyndex Services, LLC; Wanda J. Barreras; and C-7 Development Partners, LLC. From CE's perspective, the project failed, and CE never recovered financially.

Everest claims that while CE verged on financial collapse, Grisel and Morrison duped Everest into extending additional credit to CE, and that they conspired with HMCRT, Envisage, Cyndex, Barreras, and C-7 Development to defraud Everest. After a ten-day trial, a jury agreed and found for Everest on its fraud and negligent-misrepresentation claims against Grisel and Morrison and on its civil-conspiracy claim against Grisel, Morrison, HMCRT, Envisage, Cyndex, Barreras, and C-7 Development (collectively, "the Defendants"). The jury awarded Everest over $430,000 in actual damages and over $1.3 million in exemplary damages against Grisel. The trial court reduced the exemplary-damage award in accordance with Texas law and signed a judgment on the verdict awarding Everest actual damages against the Defendants jointly and severally and exemplary damages against Grisel.

The Defendants have appealed and raise eight issues: (1) Everest lacked standing to sue the Defendants; (2) Everest lacked capacity to maintain this suit

2

because it is a foreign entity not registered to do business in Texas; (3) Everest did not actually and justifiably rely on Grisel's and Morrison's alleged representations as a matter of law; (4) the evidence is insufficient to support the jury's fraud and negligent-misrepresentation findings against Morrison; (5) the evidence is insufficient to support the jury's civil-conspiracy finding against the Defendants; (6) regarding the jury's exemplary-damages predicate finding against Grisel, there is no clear and convincing evidence to support the jury's malice and gross-negligence findings, and the jury charge failed to properly define "fraud"; (7) some of Everest's comments during closing arguments were improper, incurable, and harmful; and (8) if we reverse the jury's conspiracy findings but affirm the fraud and negligent-misrepresentation findings, Grisel and Morrison cannot be held jointly and severally liable because Everest failed to request proportionate-liability findings from the jury. We will reverse and render in part on Everest's claims against Barreras and Cyndex and affirm the trial court's judgment in all other respects.

## I. Background

Everest—a logistics and import company—is a Florida LLC that does business in Texas. Everest is owned by Enoch Poon and Pat Sullins. Sullins's family friend of 25 years, Mike Jennings, owned Arlington-based CE.[1] For about 20 years, Everest had

---

[1]Jennings died in January 2017.

3

sourced and imported LapDesk products from overseas for CE to sell under its "LapGear" brand to retailers in the United States. Everest was CE's sole supplier.

## A. CE brings in Grisel and his team

Sometime in 2013, CE began experiencing financial difficulties, including mounting debt to lenders, lack of cash flow, and inability to pay its suppliers, including Everest. In September 2013, Grisel, a self-employed business consultant, was introduced to Jennings by a mutual friend. After Jennings and Grisel met several times, Grisel agreed to help CE. To that end, Grisel and Jennings agreed to a $25,000 flat fee for Grisel's services from September 2013 through February 2014.

According to Grisel, he and his company HMCRT[2] are business "turnaround specialists." The acronym HMCRT represents a "group of people" who are experts in human resources, marketing, capital, raw materials, and technology. Grisel's plan to help CE included acquiring funds for CE and bringing in a group of individuals to help CE with integration, technology, automation, prototypes, and financial practices. Among others, Grisel eventually involved the following people and entities in the CE project:

- Morrison, a software architect and Grisel's long-time friend;
- Morrison's company Envisage;

---

[2]When Grisel started working with CE, HMCRT was not incorporated, and Grisel considered it a sole proprietorship. HMCRT was incorporated in May 2014. Grisel is HMCRT's sole owner.

4

- C-7 Development, a Grisel-owned company that "does a little bit of everything" and that also owned the house in which Morrison lived;

- Barreras (who is also Morrison's sister); and

- Cyndex, a bookkeeping and corporate-setup business that Barreras and her husband own.

Envisage eventually entered into an independent-contractor agreement with CE, and under this contract, Morrison worked on integrating multiple facets of CE's business into one software package, as well as prototyping, automation, and installing a new phone system. Barreras incorporated HMCRT in May 2014 and designated Cyndex as HMCRT's registered agent. Barreras and her husband also controlled the "C-7 Trust" account, which was opened to "manage whatever assets or money went in and out" of C-7 Development. According to Barreras, funds deposited into that account belonged to Grisel even though he was not an account holder or signatory on the account, and she and her husband held those funds "in trust" for Grisel's benefit. Barreras would eventually briefly work as an independent contractor for CE, assisting with updating the employment manual and obtaining insurance.

With Jennings's approval, Grisel also recruited Ken Fazende, Ray Yauk, Ben Grisel, and Dave Simcho to work for CE. All but Yauk had criminal backgrounds. Fazende—a former CPA and former special agent for the United States Treasury Department—had federal felony convictions for a "scheme to conceal and cover up material facts" and for the "production of sexually explicit depictions of a minor for importation into the United States." Fazende was hired to work as CE's financial

5

manager and used an alias (Ken Phillips) while doing so. Grisel's younger brother Ben was an opioid addict and was under a federal indictment for conspiracy to distribute opioids while he was working at CE selling old inventory and "help[ing] with spreadsheets." Ben was in recovery and clean while working at CE but was later convicted of conspiracy to distribute. Simcho had been convicted of federal bank fraud and worked as Grisel's executive assistant under the alias Dave Marion.

## B. Grisel meets with Sullins

By early 2014, CE's relationship with Everest—CE's sole supplier—had become financially strained because CE owed Everest $933,000. On March 4, 2014, Sullins notified his long-time friend Jennings "with a heavy heart and great regret" that Everest would not ship any more goods or extend any more credit to CE. A few days later, Jennings asked Sullins to meet with Grisel.

On March 11, 2014, Sullins met with Grisel at CE's offices. According to Sullins, Grisel represented that he was a highly experienced and successful business-turnaround expert who had "turned around" many companies over the years. Grisel claimed to have a team of "experts" in human resources, management, technology, and capital, which he referred to as HMCRT. Grisel claimed that he and HMCRT were going to turn CE around, that they would "be in and out . . . in 30 to 60 days," and that Sullins "wouldn't even recognize the company when they were done."

Sullins testified that he understood that Grisel was "representing [his] company and his partner, and they were going to bring their group in and work with [CE] to

6

make improvements, put some money in, and turn it around." Sullins further understood that Grisel was authorized to negotiate with him on CE's behalf and to work with Everest to re-establish credit.

During Grisel and Sullins's meeting, Grisel represented that Morrison was his partner in HMCRT and was ready to invest $500,000 in CE immediately. Grisel also claimed that CE had been approved for an SBA loan but that he and HMCRT could help CE get more favorable loan terms because Morrison had agreed to invest $500,000 in CE. Grisel further represented that some of the $500,000 would be used to pay Everest. Grisel also asked Sullins if Everest would extend more credit to CE and share the interest costs of a bridge loan to cover CE until the SBA loan could be finalized. Sullins refused and left the meeting.

At Jennings's request, Sullins met with Grisel at CE again three days later. During this second meeting, Grisel repeated his representations from the first meeting, including Morrison's imminent $500,000 cash infusion. Grisel further represented that because of his, Morrison's, and HMCRT's involvement and the money "going in," CE would be able to timely pay Everest in the future. Grisel also promised that CE would pay Everest the past-due amounts over the next three months and that if Everest would extend new credit to CE, CE would pay Everest "on time going forward." Grisel represented that Everest's extension of credit, along with Grisel and HMCRT's involvement, would cause CE's business to grow, which would in turn lead to more business for Everest.

7

Based on Grisel's representations, Sullins was satisfied that "this is a doable deal" that would get CE "turned around," and Everest thus reopened CE's credit in the form of processing a "huge chunk of purchase orders." Sullins also agreed that Everest would pay half the interest on CE's bridge loan[3] and agreed to give CE a credit to address some quality issues on products Everest had supplied to CE in the past. After the meeting, Sullins sent Jennings an email outlining what he and Grisel had discussed.[4]

**C. Morrison's $500,000 investment**

Morrison's $500,000 immediate investment in CE turned out to be a loan from Morrison's friend Jim Thompson that didn't make its way to CE until June 2014. In March 2014, Thompson loaned the funds not to Morrison but to C-7 Development; Grisel executed the promissory note on C-7 Development's behalf, and the loan was secured by Morrison's residence, which C-7 Development owned.[5] At Grisel's direction, Barreras accepted the loan proceeds into the C-7 Trust account and then (1) distributed about $25,000 of the loan proceeds to Grisel in cash and (2) transferred

---

[3]Everest "paid" the interest on the bridge loan by "letting [CE] take it as a discount" "off of some invoices."

[4]Sullins's outline did not mention Morrison's $500,000 investment.

[5]Morrison explained at trial that he had purchased the property in 2001 and had pledged it as security for a $650,000 transaction with Grisel that "fell through," which was how C-7 Development came to own the property. After that, Morrison leased the property until he moved out in 2015 or 2016.

about $18,000 of the loan proceeds into Cyndex's account—which belonged to Barreras and her husband—to buy a car for Morrison. Grisel later directed Barreras to distribute the remaining loan proceeds to CE. In June 2014, Barreras made two $200,000-plus transfers from the C-7 Trust account to the Cyndex account. In mid-June, Barreras paid $15,000 from the Cyndex account to CE, and later that month, she paid $441,000 from the Cyndex account to CE.

**D. Everest continues extending credit to CE**

Over the next few months, Grisel and his team continued working with CE. Grisel's primary goal for CE was getting an SBA loan so that CE could pay off a $1.2 million credit line that was in default. During this time, Grisel worked with Jennings to improve CE's financials and to complete several SBA loan applications, which CE submitted to various banks. Also during this time, CE paid Grisel and Morrison each $10,000 per month in consulting fees,[6] along with thousands in fees to the other members of Grisel's "team."

Meanwhile, Everest continued to extend credit to CE based on Grisel's and Morrison's continued representations. According to Sullins, Morrison reaffirmed Grisel's representations that Morrison "was [Grisel's] business partner in [HMCRT], his financial guy, his money man, who was going to bring the $500,000 into this

---

[6]Morrison was paid through Envisage. CE paid Grisel based on a monthly invoice from Yauk's company Dry Fabrication and Welding, Inc. by wiring money to Grisel's mother-in-law's bank account.

business deal[].” But CE failed to make payments to Everest as promised. When Sullins approached Morrison in April or May 2014 about Everest’s not getting paid, Morrison told Sullins that he did not have the money and was going to have to borrow it. Sullins later learned that Grisel never intended for CE to pay Everest for the credit it was extending and was working to move CE’s business away from Everest and to a new supplier.

**E. CE never recovers, and Sullins and Poon buy most of CE’s assets**

When CE failed to obtain an SBA loan, tensions arose between Jennings and Grisel. In late October 2014, Jennings sent a memo to all CE employees explaining that over the last year or so, the company had “struggled with financial stability, which lead [sic] to our engaging the HMCRT group, including [Morrison] and [Fazende]” but that CE’s financial position had not improved because it had failed to obtain an SBA loan. On October 31, 2014, Jennings terminated CE’s relationship with the “HMCRT Group,” which according to Jennings included HMCRT, Grisel, Fazende, and Morrison.

By the time CE cut ties with Grisel, CE owed Everest over $1.32 million. Everest thus stopped extending credit to CE in October 2014 and put CE on cash-on-delivery terms. In an attempt to mitigate Everest’s losses, Sullins and Poon formed Creative Manufacturing, LLC (CM), which purchased some of CE’s assets and inventory in April 2015 and released about $122,000 of CE’s debt to Everest.

CE has never paid Everest the entire balance owed. CE and Everest continued doing limited business together on a cash basis until Jennings died in January 2017.

**F. Everest sues**

It turned out that Grisel's and Morrison's representations to Sullins were false: CE did not have an SBA loan approved in March 2014, and Morrison didn't have $500,000 to immediately invest in CE.[7] Because Everest had relied on these representations—along with Grisel's representations regarding his business-turnaround expertise and HMCRT's team of "experts"—in deciding to extend additional credit to CE, Everest sued Grisel and Morrison for fraud by misrepresentation, fraud by nondisclosure, and negligent misrepresentation. Everest also asserted a civil-conspiracy claim against Grisel, Morrison, HMCRT, Envisage, Cyndex, Barreras, and C-7 Development. Everest sought actual and exemplary damages.

At trial, Sullins testified that Grisel had represented that he was authorized to negotiate on CE's behalf and that "he was going to be coming into CE with his group to run the company going forward." Sullins stated that Grisel's representation that Morrison could immediately invest $500,000 in CE was the most important representation upon which he relied in deciding to extend credit to CE. According to Sullins, Grisel's representations that Morrison had $500,000 "in the bank" and was

---

[7]Morrison admitted at trial that he did not have $500,000 to invest in CE because he was on the verge of filing for bankruptcy.

"ready to put the money in" were important to Sullins because the quick infusion would give CE cash flow to pay its bills (especially the monies owed to Everest) and would help improve CE's financial health to increase its chance of securing an SBA loan.

Sullins further testified that Grisel had represented that Morrison was his partner in HMCRT, "his financial guy," and "his money man" who was going to bring $500,000 into CE and that Morrison "reaffirmed that to me in later meetings and discussions." Sullins stated that Everest would not have extended credit to CE if he had known that Morrison was going to have to borrow the money. He further testified that he would not have extended credit to CE if he had known that Morrison's "investment" was going to take over three months to make its way to CE. Sullins explained that this three-month delay harmed Everest because

> I got further -- they got further and further behind on me. And once that happens, they owe you so much money that if you cut them off, they're going to go out of business. So it's like now they have me over a barrel at that point. And that's where I was trying not to go on March 14th -- or on March 4th, when I discontinued business [before Jennings persuaded me to meet with Grisel]. I was trying to put a stop to the bleeding, because if I let it go any further, it would bury me.

Sullins claimed that Grisel and Morrison "told me many things that weren't true and with the express intent of asking me to extend credit to a company that they were trying to pull a big, huge SBA loan out of so that they could skim money out of that loan." Sullins also testified that under Grisel's guidance, CE falsified its financials to make the company appear healthier on its SBA loan applications.

12

According to Sullins, Grisel and his team "ran [CE] into the ground."[8] Had Sullins known what he knew at trial about Grisel and HMCRT, he would not have extended credit to CE. As a result of Grisel's and Morrison's representations to Sullins, Everest paid about $34,000 in bridge-loan interest; credited CE's account for over $17,000 to remedy a product-quality issue; and ultimately extended over $387,000 in credit to CE. Everest's losses totaled about $439,000 over and above the $933,000 that CE had already owed it.

Over the course of the ten-day trial, the jury heard testimony from Sullins; Grisel; Kris Jennings (Jennings's son); Fazende; Poon; Barreras and her husband Ray; Yauk; Morrison; Everest's counsel; and Wayne Whitaker, a Fort Worth attorney.[9] At the trial's conclusion, the jury found for Everest on its fraud and negligent-misrepresentation claims against Grisel and Morrison and found that Everest had suffered $439,129.65 in out-of-pocket losses as a result. The jury also found that the Defendants had civilly conspired to defraud Everest. The jury further found by clear and convincing evidence that Everest's harm resulted from Grisel's malice, fraud, or

---

[8]This assertion is supported by CE's financials: CE's net loss in 2013 had been about $240,000; for 2014, it more than tripled to about $774,000. Ultimately, Grisel and his team "pulled out" almost the "exact amount" they represented to Everest that they would put into CE.

[9]Grisel and Whitaker had met several years earlier through a men's Christian group. Whitaker and Simcho had tried to start a company together, and Grisel assisted them with "ideas, spreadsheets, [and] concepts."

gross negligence, and awarded Everest $1,317,388.95 in exemplary damages. The jury's verdict was unanimous.

The trial court signed a final judgment incorporating the jury's findings and (1) awarded Everest $439,129.65 in actual damages against Grisel and Morrison (for the fraud claim) and Barreras, HMCRT, Envisage, Cyndex, and C-7 Development (for the conspiracy claim), jointly and severally; (2) reduced the exemplary damages to an amount two times the amount of economic damages in accordance with Texas Civil Practice and Remedies Code Section 41.008;[10] and (3) awarded Everest $878,259.30 in exemplary damages against Grisel.

The Defendants moved for judgment notwithstanding the verdict; moved for a new trial, or alternatively, for a remittitur; and moved to modify, correct, or reform the judgment. The Defendants' motions were overruled by operation of law, and they timely appealed.

## II. Standing

In their first issue, the Defendants complain that Everest lacks standing because (1) as part of CM's purchase of CE's assets in April 2015, Everest released CE from all claims related to products sold or supplied by Everest before August 1, 2014, which included CE's debt for products that Everest had supplied to CE on credit, and (2) Everest failed to establish that the Defendants breached its legal rights.

---

[10] *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b).

## A. Applicable law and standard of review

"Standing is a constitutional prerequisite to suit," and "[a] court has no jurisdiction over a claim made by a plaintiff who lacks standing to assert it." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150 (Tex. 2012). Because standing is a component of subject-matter jurisdiction, its existence is a legal question that we review de novo. *See Farmers Tex. Cnty. Mut. Ins. Co. v. Beasley*, 598 S.W.3d 237, 240 (Tex. 2020). In evaluating standing, we construe the pleadings in the plaintiff's favor, and we consider evidence relevant to the jurisdictional inquiry. *See id.*

A standing inquiry "focuses on the question of who may bring an action." *Vernco Constr., Inc. v. Nelson*, 460 S.W.3d 145, 149 (Tex. 2015) (quoting *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998)). Generally, unless standing is conferred by statute, a plaintiff must demonstrate that it "possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury." *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex. 2001). To have standing, a plaintiff must be personally aggrieved. *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). Standing requires "a real controversy between the parties" that "will be actually determined by the judicial declaration sought," *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005) (quoting *Nootsie*, 925 S.W.3d at 662), and "focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome," *id.* at 848. "Without [a] breach of a legal right

15

belonging to the plaintiff[,] no cause of action can accrue to [its] benefit." *Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex. 1976).

**B. Analysis**

The Defendants first argue that Everest lacks standing to sue them because as a part of the asset-purchase agreement between CE and CM, Everest released CE from all claims "in any way related to products sold or supplied by Everest prior to August 1, 2014," which the Defendants contend would have included CE's debt related to products supplied by Everest. Release is an affirmative defense "where the defendant bears the burden to plead and prove the existence of an effective and valid release." *Barras v. Barras*, 396 S.W.3d 154, 170 n.5 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citing *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990)); *see* Tex. R. Civ. P. 94. Whether the release between Everest and CE released the Defendants goes to the merits of the case, which we do not consider in determining standing.[11] *See DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 305 (Tex. 2008) ("A plaintiff does not lack standing simply because he cannot prevail on the merits of his claim; he lacks standing because his claim of injury is too slight for a court to afford redress."). We thus reject the Defendants' first standing argument.

Next, the Defendants argue that Everest lacks standing because it failed to establish that any of the Defendants breached Everest's legal rights because none of

---

[11]We note that although the Defendants pleaded the affirmative defense of release, they did not request or obtain a jury finding on it.

16

the Defendants had a relationship with Everest at the time it extended additional credit to CE. In support, the Defendants rely on *Nobles*, in which the supreme court held that the plaintiffs lacked standing to maintain a fraud claim because they were not the defrauded parties. 533 S.W.2d at 927 ("A suit to set aside a deed obtained by fraud can only be maintained by the defrauded party. A party who was not defrauded by the conveyance has not suffered an invasion of a legal right and therefore does not have standing to bring suit based on that fraud." (citations omitted)). Based on *Nobles*, the Defendants argue that Everest lacks standing because they did not breach Everest's legal rights and because any alleged fraud claim belonged to CE, not Everest. They point out that at the time of Grisel's alleged representations to Everest, Grisel was not "an owner of CE, nor a shareholder, officer, director, or employee" and "had nothing to do with what products CE ordered or when Everest got paid," which, according to the Defendants, was Jennings's decision alone. The Defendants thus contend that because it was CE that owed Everest money, Everest "failed to show any breach of a legal right it had by any of the Defendants that would give rise to a cause of action for damages." The Defendants further claim that any alleged fraud claim belonged to CE, not Everest, because CE incurred further debt with Everest based on the Defendants' alleged representations.

Here, in support of its fraud claim, Everest pleaded that Grisel and Morrison intentionally made material and false representations and omissions to Everest and that Everest relied on those misrepresentations and omissions in extending additional

17

credit to CE. Similarly, in support of its negligent-misrepresentation claim, Everest pleaded that Grisel and Morrison negligently made misrepresentations upon which Everest relied in deciding to extend additional credit to CE. Everest further pleaded that the Defendants "acted in combination with one another to accomplish improper or unlawful objects and extract monies and other items of value from [Everest] by and through one or more dishonest, unlawful[,] or overt acts."

"A fraud claim is personal to the defrauded party." *Zaan, LLC v. Sangani*, No. 05-12-00423-CV, 2015 WL 2398652, at *4 (Tex. App.—Dallas May 20, 2015, pet. denied) (mem. op.) (citing *Nobles*, 533 S.W.2d at 927). "Consequently, only the defrauded party has standing to assert a fraud claim." *Id.* (citing *Nobles*, 533 S.W.2d at 927). Here, Everest's fraud and negligent-misrepresentation claims are based on Grisel's and Morrison's misrepresentations and omissions *to Everest*, and there was evidence presented at trial that based on these misrepresentations and omissions, Everest extended additional credit to CE, helped CE pay bridge-loan interest, and credited CE's account to address some product-quality issues. And its civil-conspiracy claim against the Defendants is predicated on Grisel's and Morrison's alleged fraud. Viewing Everest's pleadings in its favor and considering the trial evidence, we thus conclude that Everest had standing to maintain its fraud and negligent-misrepresentation claims against Grisel and Morrison and its civil-conspiracy claim against the Defendants. We thus overrule the Defendants' first issue.

18

The Defendants complain in their second issue that Everest lacked capacity to maintain its suit and to recover judgment because Everest (a Florida limited-liability company) is not registered to do business in Texas. *See* Tex. Bus. Orgs. Code § 9.051(b); *see also* Tex. R. Civ. P. 93(1), (2).

Shortly before trial, the Defendants filed a verified plea in abatement asserting that because Everest was a Florida LLC doing business in Texas but was not registered to do business here, Texas Business Organizations Code Section 9.051(b) prohibited Everest from maintaining or prosecuting this case. That section requires a foreign entity to register with the Texas Secretary of State to maintain a cause of action arising out of "the transaction of business" in Texas. *See* Tex. Bus. Orgs. Code. § 9.051(b). Based on Section 9.051, the Defendants argued that Everest could not maintain its suit and thus asked the trial court to abate the case "pending Everest's registration as a foreign limited liability company" in Texas or, alternatively, to dismiss the suit. At the hearing's conclusion, the trial court denied the plea in abatement and dismissal motion "for the time being." The Defendants re-urged their capacity challenge in their JNOV motion.

## A. Standard of review and applicable law

The Defendants properly raised their capacity challenge through their verified plea in abatement. *See Duradril, L.L.C. v. Dynomax Drilling Tools, Inc.*, 516 S.W.3d 147, 157 (Tex. App.—Houston [14th Dist.] 2017, no pet.). We review a trial court's ruling

on a plea in abatement for an abuse of discretion. *Wyatt v. Shaw Plumbing Co.*, 760 S.W.2d 245, 248 (Tex. 1988); *Anglo-Dutch Petroleum Int'l, Inc. v. Case Funding Network, LP*, 441 S.W.3d 612, 621 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). As the parties challenging capacity, the Defendants had the burden to prove Everest's lack of capacity. *See Christi Bay Temple v. GuideOne Specialty Mut. Ins. Co.*, 330 S.W.3d 251, 253 (Tex. 2010); *Anglo-Dutch Petroleum*, 441 S.W.3d at 621.

In Texas, "a foreign filing entity" cannot "maintain an action, suit, or proceeding in a court of this state . . . on a cause of action that arises out of the transaction of business in this state unless the foreign filing entity is registered in accordance with" Chapter 9 of the Texas Business Organizations Code. Tex. Bus. Orgs. Code Ann. § 9.051(b). Foreign LLCs must register under Chapter 9 to transact business in Texas. *Id.* § 9.001(a)(1). The registration of a foreign filing entity (other than a foreign limited-liability partnership) "is effective when the application filed under [Business Organizations Code] Chapter 4 takes effect." *Id.* § 9.008(a). With exceptions not applicable here, "[a] filing instrument submitted to the secretary of state takes effect on filing." *Id.* § 4.051. If the secretary of state finds that the filing instrument conforms to applicable code provisions and rules and that "all required fees have been paid," the secretary of state must "file the instrument by accepting it

into the filing system adopted by the secretary of state and assigning the instrument a date of filing." *Id.* § 4.002(a).

**B. Analysis**

Everest's live pleading stated that it was a Florida LLC doing business in Tarrant County, Texas. The Defendants pointed to this statement in their plea in abatement, to which they also attached as supporting evidence (1) correspondence from the Texas Secretary of State's office stating that its records reflected that Everest was not registered to do business here and (2) Sullins's deposition testimony in which he stated that Everest was a Florida corporation that operated in Texas.

In response, Everest pointed out that the Business Organizations Code expressly provides that specific activities "do not constitute transaction of business in this state," including maintaining an action or suit, maintaining a bank account, and "transacting business in interstate commerce." *Id.* § 9.251(1), (3), (9). Everest explained that although it did business in Tarrant County, "[a]t all relevant times" its principal office and all its administrative functions were based out of Florida, and its business activities in Texas and Florida involved interstate commerce. Thus, Everest argued, it was not required to register in Texas as a foreign LLC to maintain its suit. But "out of an abundance of caution, in order to avoid any argument over the matter and [to] avoid any unnecessary delay or abatement of this lawsuit," Everest filed with the secretary of state on January 28, 2019, an "Application for Registration of a Foreign Limited Liability Company," along with the required filing fees. As proof,

Everest provided a copy of its application, which was stamped "RECEIVED" by the secretary of state, and a prepaid invoice from Austin-based Lawyer's Aid Service, Inc. reflecting that the service had filed the application and paid the filing fees to the secretary of state on Everest's behalf.

During the plea-in-abatement hearing, the Defendants' attorney argued that although Everest had filed its application, he had not "received any confirmation from the Secretary of State or -- or acceptance of that application." Everest's attorney countered that Everest has taken "steps to cure any alleged defect" by filing the registration application along with all required fees. The trial court ruled from the bench, stating

> Well, for the time being, the plea in abatement and the motion to dismiss will be denied. I think that up until the time of judgment it can be cured. So we're going to go ahead and proceed to trial, and if it's not cured by the time judgment is rendered, we will revisit the issue.

During trial, Sullins testified that Everest was "licensed to operate in Texas." The Defendants re-urged their capacity argument in their JNOV motion.

On appeal, the Defendants assert that because Everest never established that it had complied with Section 9.051(b)'s registration requirement, it failed to establish its capacity to maintain suit and to recover under the judgment. Everest counters that it did establish compliance but that even if it didn't, the Defendants failed to preserve their capacity complaint because they did not object to the jury charge, which assumed that Everest had capacity to sue. *See Damian v. Bell Helicopter Textron, Inc.*,

22

352 S.W.3d 124, 141–42 (Tex. App.—Fort Worth 2011, pet. denied) (explaining that when a defendant challenges capacity though a verified denial, the plaintiff bears the burden of proving at trial that it is entitled to recover in the capacity in which it has sued but that, to preserve a capacity complaint, the defendant must object to jury questions that assume the capacity pleaded). *But cf. Bossier Chrysler Dodge II, Inc. v. Rauschenberg*, 201 S.W.3d 787, 798 (Tex. App.—Waco 2006) ("If a verified plea in abatement is filed, the filing party should seek a hearing on the plea. If the plea is overruled, then the matter has been preserved for appellate review."), *rev'd in part on other grounds*, 238 S.W.3d 376 (Tex. 2007).

Assuming that the Defendants have preserved their capacity complaint for our review and that Everest was required to register to do business in Texas to maintain suit, we conclude that the trial court did not abuse its discretion by denying the Defendants' plea in abatement. The Defendants bore the burden to prove that Everest lacked capacity. The Defendants presented evidence that Everest was not registered to conduct business in Texas, and in response, Everest presented evidence that it had submitted an application to the secretary of state and had paid the required fees. *See* Tex. Bus. Orgs. Code Ann. § 4.051 (stating that "[a] filing instrument submitted to the secretary of state takes effect on filing"); *see also id.* § 4.002(a) (stating that the secretary of state "shall" file a filing instrument upon finding that it conforms to applicable code provisions and rules and that all required fees have been paid). The Defendants never brought forward any evidence that Everest's application was not in

23

fact filed by the Texas Secretary of State. We thus conclude that the trial court did not abuse its discretion by denying the Defendants' plea in abatement.

Additionally, on our own motion and for the first time on appeal we may take judicial notice of adjudicative facts that are matters of public record. *See* Tex. R. Evid. 201; *Rockstar Remodeling & Diamond Decks, LLC v. Taddia*, No. 03-19-00657-CV, 2020 WL 1540740, at *2 n.2 (Tex. App.—Austin Apr. 1, 2020, no pet.) (mem. op.). A search of Everest's franchise-tax-account status on the Texas Comptroller's website shows that Everest's right to transact business in Texas is "active" and that Everest's effective registration date with the Texas Secretary of State was January 28, 2019. We take judicial notice of these facts showing that Everest was in fact registered to do business.

We overrule the Defendants' second issue.

## IV. Sufficiency of the Evidence

The Defendants' third, fourth, fifth, and sixth issues challenge the sufficiency of the evidence supporting several of the jury's findings. We address each issue in turn.

### A. Standards of Review

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere

24

scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *see also Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## B. Everest's Reliance

In their third issue, the Defendants argue that no evidence supports the jury's fraud and negligent-misrepresentation findings because Everest's reliance on Grisel's

and Morrison's alleged misrepresentations and omissions was not actual or justified. The Defendants contend that because Sullins and Poon—who are experienced, sophisticated businessmen—raised and ignored multiple "red flags," justifiable reliance was negated as a matter of law.

**1.** *Applicable law*

To prevail on its claims for fraud by misrepresentation, fraud by nondisclosure, and negligent misrepresentation, Everest had to prove (among other things) that it actually and justifiably relied on Grisel's and Morrison's misrepresentations or omissions.[12] *See, e.g., Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (op. on reh'g) (stating that fraud and negligent misrepresentation require a showing of actual and justifiable reliance); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) (explaining that fraud by nondisclosure is a subcategory of fraud and that because reliance is an element of fraud, it is likewise an element of fraud by nondisclosure); *BP Am. Prod. Co. v. Zaffirini*, 419 S.W.3d 485, 506 (Tex. App.—San Antonio 2013, pet. denied) (stating that like common-law fraud, fraud by nondisclosure includes the element of justifiable reliance). Justifiable reliance

---

[12]The (unobjected-to) fraud question to the jury was a broad-form question in which the jury was instructed that fraud included fraud by misrepresentation and fraud by nondisclosure. Thus, the jury's fraud findings against Grisel and Morrison could be based on either or both theories.

usually presents a fact question for a jury to decide.[13] *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 497 (Tex. 2019) (citing *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018)). But the element can be negated as a legal matter when circumstances exist under which reliance cannot be justified. *Orca Assets*, 546 S.W.3d at 654. "Red flags" indicating that reliance is unwarranted is one such circumstance. *See Barrow-Shaver Res.*, 590 S.W.3d at 501 (citing *Orca Assets*, 546 S.W.3d at 655).

---

[13]When, as here, the court's charge is submitted to the jury without objection, we measure the sufficiency of the evidence against the court's charge. *See Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005) (citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001)). The charge tracked the Texas Pattern Jury Charges for fraud by misrepresentation, fraud by nondisclosure, and negligent misrepresentation. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment* PJC 105.2, 105.4, 105.19 (2018). In conformity with the pattern charges, the fraud-by-misrepresentation and fraud-by-nondisclosure instructions did not explicitly instruct the jury that Everest's reliance must have been justifiable. *See id.* PJC 105.2, 105.4. Nevertheless, we will assume without deciding that Everest was required to prove that its reliance was justified to prevail on its fraud claim. *See Nelson v. McCall Motors, Inc.*, 630 S.W.3d 141, 147–48 (Tex. App.—Eastland 2020, no pet.) (concluding that although the jury charge did not explicitly instruct the jury that the plaintiff's reliance must be justifiable, the fraud instruction requiring the plaintiff to prove reliance "necessarily included the inquiry as to whether any reliance was justifiable" and thus considering whether justifiable reliance was negated as a legal matter (citing *Ginn v. NCI Bldg. Sys., Inc.*, 472 S.W.3d 802, 829–31 (Tex. App.—Houston [1st Dist.] 2015, no pet.))); *see also Lake v. Cravens*, 488 S.W.3d 867, 895 (Tex. App.—Fort Worth 2016, no pet.) (op. on reh'g) ("[R]eliance is a necessary element of a statutory fraud claim, and we assume that the reliance must have been justifiable."). *But see Harstan, Ltd. v. Si Kyu Kim*, 441 S.W.3d 791, 799 (Tex. App.—El Paso 2014, no pet.) (refusing to consider whether there was sufficient evidence of justifiable reliance when measuring the sufficiency of the evidence supporting a fraud finding because no party complained of the jury charge's failure to require that the plaintiff's reliance was justified); *Ghosh v. Grover*, 412 S.W.3d 749, 756 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (same).

"In measuring justifiability, we must inquire whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.'" *Grant Thornton*, 314 S.W.3d at 923 (quoting *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990)). In an arm's-length transaction, a plaintiff must exercise ordinary care to protect its own interests. *Orca Assets*, 546 S.W.3d at 654. Mere confidence in the defendant's honesty and integrity does not excuse a plaintiff's failure to exercise reasonable diligence. *Id.* (citing *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015)). "[W]hen a party fails to exercise such diligence, it is 'charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated.'" *Id.* (quoting *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 232 (Tex. App.—Dallas 2012, no pet.)). A party "cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations." *Id.* (quoting *Shafipour v. Rischon Dev. Corp.*, No. 11-13-00212-CV, 2015 WL 3454219, at *8 (Tex. App.—Eastland May 29, 2015, pet. denied) (mem. op.)).

But "[o]ne does not have to conduct an independent investigation or audit to justifiably rely on another party's false, material representation when the misrepresentations are not 'outlandish, preposterous, or so patently and obviously false' that one would have to close his or her eyes to avoid discovering their

28

falseness." *Spicer v. Maxus Healthcare Partners, LLC*, 616 S.W.3d 59, 120 (Tex. App.—Fort Worth 2020, no pet.) (op. on reh'g) (quoting *Hannon, Inc. v. Scott*, No. 02-10-00012-CV, 2011 WL 1833106, at *8 (Tex. App.—Fort Worth May 12, 2011, pet. denied) (mem. op.)).

### 2. *Analysis*

As the Defendants point out, Sullins and Poon are educated, experienced businessmen: Sullins has a bachelor's degree in business management; Poon has degrees in mathematics and computer science, a law degree, and a business-management certificate. Both men have been in the import business together since the early 2000s and jointly own Everest, a business that sources, manufactures, and ships products globally.

As evidence of "red flags" negating Everest's justifiable reliance as a matter of law, the Defendants point to two email exchanges that occurred in between Sullins's two meetings with Grisel in March 2014—the first email being between Sullins and Jennings and the second among Sullins, Poon, and Jennings. In the first, which occurred immediately after Sullins's first meeting with Grisel, Sullins wrote to Jennings to express his frustration that CE owed Everest money and to let Jennings know that Sullins felt like Jennings had "set [him] up for an ambush" because during the meeting, Grisel had asked for a discount on the amounts CE owed Everest. In response, Jennings assured Sullins that Everest's sharing the cost of the bridge loan was Grisel's idea and was not a "premeditated set-up to ambush" Sullins. Jennings

29

stated, "I believe the best chance for CE to survive[,] and in short term thrive, is to engage with [Grisel's] group. I trust them completely." Because this exchange raised no questions about Grisel's alleged assurances, it has no "red flags."

Just before Sullins and Grisel's second meeting, Sullins, Poon, and Jennings exchanged emails. Sullins stated that he had questions about a trade-credit program that Grisel had mentioned in their first meeting; specifically, Sullins wanted an explanation of how the program worked and written proof that CE had been accepted into the program. For his part, Poon was "looking for some concrete assurances of payment" and had concerns about Grisel's liquidity because Grisel "did not seem to have the liquid capital that a normal equity investor possesses when investing into a venture. As such, we may need to have letters of credit or standby letters of credit before accepting and fulfilling orders for CE."[14] Jennings responded that he was "confident that we can get this thing back on good footing and instill confidence by paying within agreed[-]to terms going forward" and that he and Grisel "had come to an agreement in principal [sic]" but that it was "dependent on finalizing stability with Everest." Jennings continued,

> On one hand you are looking for assurances from [Grisel] and his group but on the other hand they are looking for assurances from Everest. I am concerned that you are only looking from one perspective and not seeing that they to[o] will have capital risk going forward and do not know you any better than you know them.

---

[14]According to Poon, no representations were made directly to him, and Sullins had relayed everything to him.

Jennings ended with, "I am confident that if [Sullins] will work with [Grisel] to iron out all details, we can move forward to all parties['] satisfaction."

Regarding this second email exchange, Sullins's questions about the trade-credit program are irrelevant because, as Sullins explained at trial, "it turned out that this was nothing that would have benefited me anyway, so it didn't matter." After this exchange, Grisel and Sullins met for a second time, and as noted, Grisel reiterated his representations from their first meeting. Among them were (1) Grisel was going to bring in his group of "experts" to turn CE around, and (2) Morrison was going to immediately invest $500,000, some of which would be used to pay Everest. And after this meeting both Grisel and Morrison continued to make assurances to Sullins, with Morrison reaffirming Grisel's representation that he was Grisel's business partner and "was going to bring the $500,000 into this business deal[]."

No evidence shows that Everest asked for letters of credit or some other confirmation of Grisel's or Morrison's liquidity. Sullins testified that he did not believe that any "cheating" was involved or that he "needed a written agreement." He further testified that he "thought [Grisel] was being honest with [him]" and that Grisel was "very persuasive and charismatic, and so I fell for the whole deal, hook, line, and sinker, like an idiot." Although mere confidence in a defendant's honesty and integrity does not excuse a plaintiff's failure to exercise reasonable diligence, *see Orca Assets*, 546 S.W.3d at 654, the jury could have found that Everest exercised reasonable diligence and was not willfully blind, for at least two reasons. First, Jennings—who

31

had been working with Grisel for months and had done business with Sullins for about 20 years—told Sullins that he trusted Grisel's group "completely" and believed that it was the "best chance for CE to survive." Second, Grisel did obtain the $500,000 shortly after his second meeting with Sullins—albeit through a loan to C-7 Development from Morrison's friend rather than an investment from Morrison—but Grisel withheld the funds from CE for three months. In other words, access to funds was not an issue; Grisel had access to the funds but withheld them from CE. And Morrison assured Sullins that the money was on its way.

Accordingly, viewing the evidence in a light most favorable to the verdict, we hold that the evidence was sufficient for a reasonable jury to find that Everest actually and justifiably relied on Grisel's and Morrison's misrepresentations and omissions. We thus overrule the Defendants' third issue.

## C. Morrison's Fraud and Negligent Misrepresentations

In their fourth issue, the Defendants challenge the sufficiency of the evidence supporting the jury's fraud and negligent-misrepresentation findings against Morrison. First, the Defendants argue that Morrison never made a false, material representation to Everest and never supplied false information to Everest. Second, the Defendants contend that Morrison had no legal duty to disclose material facts to Sullins but that even if he did, Morrison "did not know any of the facts relating to the $500,000 that were discussed by Sullins and Grisel during the March 14, 2014 meeting."

**1.** *Fraud by misrepresentation and negligent misrepresentation*

To recover on its fraud claim against Morrison under a fraud-by-misrepresentation theory, Everest had to prove, among other things, that Morrison made a material, false representation to Everest. *See Orca Assets*, 546 S.W.3d at 653. To succeed on its negligent-misrepresentation claim against Morrison, Everest had to prove, among other things, that Morrison—in the course of his business or in a transaction in which he had a pecuniary interest—supplied to Everest false information for guidance in a business transaction. *See id.* The Defendants argue that because Morrison had no contact with Everest until after Sullins's second meeting with Grisel, Morrison could not have made any misrepresentations upon which Sullins relied in deciding to reopen credit with CE. The Defendants thus contend that the evidence is legally and factually insufficient to support the jury's fraud-by-misrepresentation and negligent-misrepresentation findings.

Here, the evidence enabled the jury to reasonably infer that Sullins continued extending credit to CE based on Morrison's representations after Sullins's second meeting with Grisel. According to Sullins, at some point after that meeting, Morrison reaffirmed Grisel's representations that Morrison "was [Grisel's] business partner in [HMCRT], his financial guy, his money man, who was going to bring the $500,000 into this business deal[]." When CE failed to make promised payments to Everest, Sullins approached Morrison, who told him in April or May 2014 that he did not have the funding but would get it. Sullins also testified that Grisel and Morrison

33

"told me many things that weren't true and with the express intent of asking me to extend credit to a company that they were trying to pull a big, huge SBA loan out of so that they could skim money out of that loan."

Viewing this evidence in a light most favorable to the verdict, the evidence was sufficient for a reasonable jury to conclude that Morrison made representations on which Everest relied in continuing to extend credit to CE, and the evidence thus sufficed to support the jury's fraud-by-misrepresentation and negligent-misrepresentation findings against Morrison. Likewise, considering and weighing all the evidence, the evidence supporting these findings is not so weak that the findings are clearly wrong and manifestly unjust. We overrule this part of the Defendants' fourth issue.

### 2. *Fraud by nondisclosure*

To prevail on its fraud-by-nondisclosure claim against Morrison, Everest had to establish, among other things, that Morrison failed to disclose material facts to Everest that he had a duty to disclose. *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219 (Tex. 2019). The Defendants argue for the first time on appeal that the evidence is legally insufficient to support the jury's fraud-by-nondisclosure finding against Morrison because as a matter of law, he had no duty to disclose material facts to Everest.

"As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information. . . . Whether such a duty exists is a

question of law." *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) (citations omitted); *see also* Comm. on Pattern Jury Charges, *supra*, PJC 105.4 cmt. (explaining that failure-to-disclosure instruction should accompany common-law fraud question "if the court finds that there is a duty to disclose"). To preserve this matter-of-law issue for our review, the Defendants were required to raise it in the trial court through one or more of the following methods: (1) a motion for directed verdict; (2) a JNOV motion; (3) an objection to submitting the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a new-trial motion. *See, e.g., T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992). Although the Defendants challenged the sufficiency of the evidence to support the jury's fraud-by-nondisclosure finding, they never complained in the trial court that, as a legal matter, Morrison owed Everest no duty to disclose. By not raising this legal issue in the trial court, the Defendants failed to preserve this argument for our review. *See id.*; *see also* Tex. R. App. P. 33.1; *Battaglia v. Alexander*, 93 S.W.3d 132, 140 (Tex. App.—Houston [14th Dist.] 2002), *aff'd in part, rev'd in part sub nom. Carl J. Battaglia, M.D., P.A. v. Alexander*, 177 S.W.3d 893 (Tex. 2005).

The Defendants also challenge the sufficiency of the evidence supporting the fraud-by-nondisclosure finding arguing that "the record conclusively established that Morrison had no knowledge relating to [Grisel and Sullins's] alleged 'agreement' (or its terms or related representations) and, thus, could not be liable for failing to disclose information he did not have." But, as described above, Morrison reaffirmed Grisel's

35

representations regarding the quick infusion of $500,000 into CE. Morrison admitted at trial that Grisel's representation that Morrison would invest $500,000 in CE was false because Morrison was financially incapable of "putting in money to" CE "as equity or a loan" at that time. And Morrison knew that the funds were a loan from his friend Thompson because he had arranged that loan. And because Morrison had arranged the loan, he would have known that Grisel had already obtained the funds but had not paid them to CE. Even so, Morrison failed to disclose this information to Everest.

Viewing all this in a light most favorable to the verdict, the evidence was sufficient for a reasonable jury to conclude that Morrison failed to disclose material facts to Everest, and the evidence was thus sufficient to support the jury's fraud-by-nondisclosure finding against Morrison. Likewise, considering and weighing all the evidence, the evidence supporting this finding is not so weak that the finding is clearly wrong and manifestly unjust.

We overrule the rest of the Defendants' fourth issue.

## D. Conspiracy

At trial, Sullins explained that Everest's conspiracy claims involved the Defendants' use of the $500,000 "loan" to convince Everest to re-open credit to CE. The jury found that each of the Defendants had conspired to defraud Everest, and their fifth issue challenges those findings. Specifically, the Defendants contend that

the evidence is insufficient to support the specific-intent and meeting-of-the-minds conspiracy elements.

**1.** *Applicable law*

A civil-conspiracy claim has five elements: (1) a combination exists of two or more persons; (2) those persons seek to accomplish an object or course of action; (3) those persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) the plaintiff is damaged as a proximate result of the wrongful act. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017) (citing *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)). "An actionable civil conspiracy requires specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means." *Id.* (citing *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 881 (Tex. 2010)). This "requires a meeting of the minds on the object or course of action." *Id.* (citing *Swinnea*, 318 S.W.3d at 881). An actionable civil-conspiracy claim thus exists "only as to those parties who are aware of the intended harm or proposed wrongful conduct at the outset of the combination or agreement." *Id.* (citing *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996)).

Conspiracy is typically proved by circumstantial evidence. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968). "Circumstantial evidence may be used to establish any material fact, but it must constitute more than mere suspicion." *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269,

278 (Tex. 1995); *see Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993) ("[S]ome suspicion linked to other suspicion produces only more suspicion, which is not the same as evidence."); *Schlumberger Well Surveying Corp.*, 435 S.W.2d at 858 (stating that "vital facts may not be proved by unreasonable inferences from other facts and circumstances" and that any vital fact must be proved "by evidence amounting to something more than a mere scintilla"). "When viewing meager circumstantial evidence, if 'circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred.'" *Transp. Ins.*, 898 S.W.2d at 278 (quoting *$56,700 in U.S. Currency v. State*, 730 S.W.2d 659, 662 (Tex. 1987)). Circumstantial evidence can include the alleged conspirators' acts or statements. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963) ("The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators.").

## 2. *Analysis*

The Defendants argue that no evidence shows that any of them knew that the object of their actions "was to defraud Everest into extending further credit to CE with the use of the $500,000 loan and cause Everest to lose money" and that no evidence establishes any point in time "at the outset of the agreement"—that is, Grisel and Sullins's March 2014 meetings—"when all the alleged co-conspirators

38

reached an agreement on a preconceived plan to defraud Everest and cause damages." In short, the Defendants argue that "Everest failed to present evidence that each alleged conspirator knew at the beginning about some plan to defraud Everest in connection with the $500,000 loan, specifically intended to do it, and understood that all the others had a common purpose and plan."

The first paragraph of the civil-conspiracy instruction in the charge followed the pattern jury charge,[15] but the second paragraph permitted the jury to find a conspiracy even if the party was not in on it from the beginning:

> To be part of a conspiracy, an individual named below and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to Plaintiff. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

> A party may join a conspiracy already in progress and upon joining the conspiracy, the party becomes a party to every act previously or subsequently committed by any of the other conspirators in pursuit of the conspiracy.

Because the Defendants did not object to the charge, we must review the evidentiary sufficiency supporting the jury's civil-conspiracy findings in light of the charge submitted. *See Romero*, 166 S.W.3d at 221.

Here, the evidence showed that Grisel, with the intent to induce Everest into extending additional credit to CE, represented to Sullins that Morrison would infuse $500,000 into CE and that Grisel and his team of experts were going to turn CE

---

[15] *See* Comm. on Pattern Jury Charges, *supra*, PJC 109.1.

around. Grisel further represented that CE would use the $500,000 for two purposes: (1) to pay some of what it owed Everest and (2) to improve CE's financials so that CE could secure more favorable terms on its already-approved SBA loan. According to Sullins, Morrison reaffirmed Grisel's representations that Morrison "was [Grisel's] business partner in [HMCRT], his financial guy, his money man, who was going to bring the $500,000 into this business deal[]." When CE failed to pay Everest as promised, Sullins approached Morrison, who told him in April or May 2014 that he did not have the funding but would get it. Additionally, the jury heard Jennings's written statement, which his son read to the jury, that "Morrison confirmed that a previous deal he was in with [Grisel] lost money and this (CE) deal was a way to get [Morrison's] money back." *See Int'l Bankers*, 368 S.W.2d at 582 ("Inferences of concerted action may be drawn from joint participation in the transactions and from enjoyment of the fruits of the transactions . . . ."). The jury also heard evidence that Grisel and Morrison started meeting regarding CE in March 2014. From this evidence, a jury could reasonably conclude that Grisel and Morrison agreed to work together to convince Everest to extend credit to CE to keep CE in business long enough to secure the SBA loan, all the while skimming as much money as possible from CE in the form of their monthly $10,000 consulting fees.

Viewing the evidence in a light most favorable to the verdict, we thus hold that the evidence was sufficient for a reasonable jury to conclude that Grisel and Morrison knew about, agreed to, and intended the common objective of defrauding Everest

into reopening and into continuing to extend credit to CE with the promise of a quick $500,000 infusion into CE, and the evidence is thus sufficient to support the jury's civil-conspiracy findings against Grisel and Morrison. Likewise, considering and weighing all the evidence, the evidence supporting these findings is not so weak that the findings are clearly wrong and manifestly unjust. And because the jury was instructed that corporate entities act through their agents[16] and that a party could join a conspiracy already in progress, we conclude that the evidence was sufficient to support the jury's conspiracy findings as to HMCRT and Envisage.

---

[16]Regarding the corporate entities, the Defendants argue that, as a legal matter, a corporation cannot conspire with itself through its agent. We agree that this correctly states the law. *See Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 381 (Tex. App.—Dallas 2009, pet. denied) (op. on reh'g) ("As a general rule, a corporation cannot conspire with itself through its agents."); *see also Crouch v. Trinque*, 262 S.W.3d 417, 427 (Tex. App.—Eastland 2008, no pet.); *Fojtik v. First Nat'l Bank of Beeville*, 752 S.W.2d 669, 673 (Tex. App.—Corpus Christi 1988), *writ denied*, 775 S.W.2d 632 (Tex. 1989). But if an agent acts for his own personal gain, rather than on behalf of the company, then the corporation can conspire with its agent. *See Fojtik*, 752 S.W.2d at 673; *see also Tex.–Ohio Gas, Inc. v. Mecom*, 28 S.W.3d 129, 138 (Tex. App.—Texarkana 2000, no pet.) (agreeing that the law is that "a corporate agent can conspire with its corporation if the agent is not acting in his corporate capacity").

Even so, the Defendants did not raise this matter-of-law point in the trial court. As noted, to preserve a matter-of-law issue for our review, the Defendants were required to raise it in the trial court through one or more of the five methods we listed previously. *See, e.g., T.O. Stanley Boot Co.*, 847 S.W.2d at 220. Although the Defendants challenged the evidentiary sufficiency to support the jury's conspiracy findings, they failed to complain in the trial court that, as a legal matter, a corporation cannot conspire with itself through its agents. By not doing so, the Defendants failed to preserve this argument for our review. *See id.*

41

We likewise conclude that the evidence was sufficient as to C-7 Development. Grisel testified that "[t]he money came from C[-]7 Development Partners, which was me, which I took from my company and put into [CE]," and that he believed that he had "personally" invested $500,000 into CE. We thus conclude that viewing the evidence in the light most favorable to Everest, a reasonable jury could have concluded that C-7 Development knew about, agreed to, and intended the common objective of defrauding Everest into reopening and into continuing to extend credit to CE with the promise of a quick $500,000 infusion into CE. Likewise, considering and weighing all the evidence, the evidence supporting the conspiracy finding against C-7 Development is not so weak that the finding is clearly wrong and manifestly unjust.

We cannot, however, so conclude about Barreras and her company Cyndex. Although both had a role in holding and transferring the $500,000, this is insufficient to prove that either of them knew about, agreed to, and intended a common objective that damaged Everest. As noted, Thompson loaned the funds to C-7 Development, and Grisel executed the promissory note on C-7 Development's behalf. Barreras testified that, at Grisel's direction, she accepted the loan proceeds from Thompson into the C-7 Trust account and then (1) distributed about $25,000 of the loan proceeds to Grisel in cash and (2) transferred about $18,000 of the loan proceeds into Cyndex's account—which belonged to Barreras and her husband—to buy a car for her brother, Morrison. Grisel later directed Barreras to distribute the remaining loan proceeds to CE, and in June 2014, Barreras made two $200,000-plus transfers from

42

the C-7 Trust account to the Cyndex account. Shortly thereafter, Barreras paid $15,000 from the Cyndex account to CE, and later that month, she paid $441,000 from the Cyndex account to CE. Barreras testified that although she received and deposited the $500,000 loan, made withdrawals and payments from the C-7 Trust account, transferred funds from the C-7 Trust account to Cyndex's account, and issued checks from Cyndex's account to CE, she did so at Grisel's direction, did not know anything about the loan, and did not know what happened to the money after she sent it to CE. And although Barreras incorporated HMCRT in May 2014, designated Cyndex as HMCRT's registered agent, and briefly worked as an independent contractor for CE, this is insufficient to prove that Barreras was in on the conspiracy.

Although both direct and circumstantial evidence may be used to establish any material fact, *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004), a fact is established by circumstantial evidence when it can be fairly and reasonably inferred from other facts proved in the case, *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). But to withstand a legal-sufficiency challenge, circumstantial evidence still must consist of more than a scintilla. *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995). Here, the evidence of Barreras's and Cyndex's involvement with the other defendants is circumstantial evidence of their participation in the conspiracy, but it cannot be fairly and reasonably inferred from that evidence that Barreras and Cyndex knew about, agreed to, and intended a common objective or course of action to defraud

43

Everest into reopening and into continuing to extend credit to CE. Accordingly, we conclude and hold that while the evidence is legally and factually sufficient to support the jury's civil-conspiracy findings against Grisel, Morrison, HMCRT, Envisage, and C-7 Development, there is no evidence to support the findings against Barreras and Cyndex. We thus sustain the Defendants' fifth issue in part and overrule it in part.

## E. Exemplary Damages

The Defendants' sixth issue challenges the jury's affirmative answer to the exemplary-damages predicate question because "neither malice, fraud, nor gross negligence lawfully support[s] an award of punitive damages." Concerning malice and gross negligence, the Defendants argue that Everest "presented no evidence, much less clear and convincing evidence," to support an affirmative answer to the predicate question based on either malice or gross negligence. Regarding fraud, the Defendants contend that "fraud could not provide a lawful predicate for any award of punitive damages" because the instructions defined fraud as including constructive fraud, which is not a proper predicate for exemplary damages under Chapter 41 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 41.001(6), .003(a)(1). We address the Defendants' fraud-related argument first because it is dispositive of this issue.

### 1. *The charge*

The jury answered "yes" to the exemplary-damages predicate question, which read as follows:

44

Answer the following question only related to [the fraud question as to Grisel] or [the negligent-misrepresentation question as to Grisel] only if you unanimously answered "Yes" to [the fraud question as to Grisel] and/or [the negligent-misrepresentation question] as to Defendant Grisel. Otherwise, do not answer the following question.

. . . .

Do you find by clear and convincing evidence that the harm, if any, found in [the fraud question as to Grisel] to Plaintiff Everest resulted from malice or fraud, or the harm, if any, found in [the negligent-misrepresentation question as to Grisel] resulted from gross negligence by Defendant Grisel?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Defendant Grisel to cause substantial injury or harm to Plaintiff Everest;

"Fraud" is as defined in [the fraud question].

"Gross negligence" means an act or omission by Defendant Grisel,

    (a)    which when viewed objectively from the standpoint of Defendant Grisel at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

    (b)    of which Defendant Grisel had actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

The instructions accompanying the fraud question stated that fraud occurs when:

a.    a party makes a material misrepresentation, and

45

b.    the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

c.    the misrepresentation is made with the intention that it should be acted on by the other party, and

d.    the other party relies on the misrepresentation and thereby suffers injury.

The instructions further stated that fraud also occurs when,

a.    a party fails to disclose a material fact within the knowledge of that party, and

b.    the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; and

c.    the party intends to induce the other party to take some action by failing to disclose the fact, and

d.    the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

## 2. *Analysis*

The Defendants do not challenge the sufficiency of the evidence supporting an affirmative answer to the predicate question based on either fraud definition. They argue, however, that because the charge included an inappropriate theory of recovery—fraud by nondisclosure—along with an appropriate theory of recovery— fraud by misrepresentation—fraud cannot support Everest's recovery of exemplary

damages.[17] *See id.* § 41.001(6) ("'Fraud' means fraud other than constructive fraud."), § 41.003(a)(1) (providing that fraud is a ground for recovery of exemplary damages); *see also* Comm. on Pattern Jury Charges, *supra*, PJC 105.4 cmt. (noting in comment accompanying fraud-by-nondisclosure instruction that constructive fraud cannot serve as a predicate for recovery of exemplary damages and that "[a]ccordingly, if fraud is an underlying theory of liability as well as a predicate for recovery of exemplary damages, constructive fraud should be submitted separately from intentional or statutory fraud"); PJC 115.37B cmt. (noting same in comment accompanying exemplary-damages predicate question and instruction).

If a broad-form question incorporates both valid and invalid bases for liability, such commingling may result in harmful error. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000) (op. on reh'g) (holding that "when a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory"). The supreme court has determined that the *Casteel* harmful-error analysis applies to broad-form damages questions mixing valid and invalid elements of damages. *See Harris Cnty. v. Smith*, 96 S.W.3d 230, 232–35 (Tex. 2002) (extending

---

[17]The Defendants do not dispute that malice and gross negligence are appropriate grounds for recovery of exemplary damages here. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 41.001(7), (11), .003(a)(2), (a)(3).

*Casteel*'s reasoning to damages questions); *see also Burbage v. Burbage*, 447 S.W.3d 249, 255 (Tex. 2014) (citing *Smith* for the proposition that "broad-form damages questions" that incorporate both valid and invalid damages elements may result in harmful error). But to preserve such a complaint for appellate review, a party must raise a *Casteel*-type objection to the charge. *See Burbage*, 447 S.W.3d at 256.

Here, we cannot possibly determine whether and to what extent the jury's affirmative answer to the predicate question was based on a fraud-by-nondisclosure finding. *See Smith*, 96 S.W.3d at 234 (holding that a single broad-form question mixing valid and invalid damages elements constitutes harmful error because an appellate court cannot determine the extent to which the jury's damages award was based on an invalid, or unsupported, element). But because the Defendants did not object to the charge in the trial court, they have failed to preserve this issue for our review and thus cannot now complain about the charge.[18] *See Burbage*, 447 S.W.3d at 256 ("[I]n situations where a party does not raise a *Casteel*-type objection, that party surely cannot raise a *Casteel* issue when it failed to preserve a claim of an invalid theory of liability

---

[18]Citing *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463 (Tex. 2017), the Defendants contend that they weren't required to object to the charge and preserved their complaint by raising it in their JNOV motion. In *Levine*, the supreme court determined that when "the wrong theory of recovery was submitted and the correct theory of recovery was omitted entirely, the defendant has no obligation to object." *Id.* at 481. The court held that the appellant had preserved error by raising the argument in a JNOV motion. *Id.* at 482. Here, however, there were multiple correct exemplary-damage theories—fraud by misrepresentation, malice, and gross negligence—submitted in the predicate question. We thus conclude that *Levine* does not apply.

that forms the basis of a *Casteel*-type error."); *see also* Tex. R. App. P. 33.1; Tex. R. Civ. P. 274. And because the Defendants have not challenged the sufficiency of the evidence supporting the jury's affirmative answer to the exemplary-damages predicate question based on fraud, we thus overrule their sixth issue.

## V. Incurable Jury Argument

In their seventh issue, the Defendants contend that Everest's counsel engaged in incurable jury argument by suggesting during closing that Grisel should not be believed and was untrustworthy because he had invoked his Christian religious beliefs to persuade the jury that he was "pious and good." The Defendants argue that these "statements—particularly when coupled with other comments—were of such a nature, degree, and extent that an instruction from the [trial] court or a retraction could not remove their prejudicial effects" on the Defendants.

## A. Everest's Jury Argument

The Defendants complain that during closing argument, Everest's counsel referred to the Defendants as "crooks," "frauds," and "liars" and accused them of "crookery," "snookering," and lying to the jury during "every day of the trial." The Defendants further complain about this part of Everest's closing argument:

> Well, I wonder what [the Defendants] thought that proved this morning, having you come back from last Friday to hear this one witness, some lawyer in Fort Worth that they were headed down a business path with that -- that Grisel had directed him to his good friend Simcho, a convicted felon, and they had this -- the lawyer about to go in business with him.

49

[Grisel and the Fort Worth lawyer] met at a Bible study. Where have we heard the injection of religion injected for your benefit? And you see it all the time in jury trials where some sanctimonious defendant caught in fraud will say: Well, I go to Bible study.

"I know the day that Christ is returning," do you remember that testimony? That -- that was when Mike Jennings, in his statement, said and [his son] Kris Jennings said: That's when I knew that this guy Joe Grisel was a fraud. He told us through his numerology he knew the day Christ would return.[19]

---

[19]According to Jennings's written statement read into evidence at trial by his son, Jennings and Grisel "had a casually mutual agreement that religion and business could mix," but that Jennings later learned, "as we spent significant amounts of time together, that [Grisel's] spiritual opinions were extreme and it sometimes led to uncomfortable conversations that included [Grisel's] claiming that he was certain of the time when Christ was going to return."

Regarding Grisel's involvement at CE, Jennings's son, who also worked at CE, testified that he too became a skeptic:

There were two family members that I saw as probably carrying some deadweight that I kind of felt like, okay, finally, we're getting a consulting firm in here, which usually a consulting firm will come in and there's no more family biasness, so some things could get cleaned up.

And when I saw Joe being more buddied up with my uncle that didn't really do anything, it was more of a kissing-up game to my dad to keep the con on as long as he could to drain as much money as he could.

And then when he was doing his numerology on the white board in my dad's office claiming that he knew the exact day and time Jesus was going to return, I -- I -- I was pretty much just done at that point.

So to answer the question, it was the dragging on of claiming to be a consulting group and then not -- not being that at all definitely drained the last bit of life, of possible turnaround or some value that my dad could have had in the company, could have kept on through a percentage of it, but bleeding it that dry left him no choice but to lose it completely.

It is a sad travesty when frauds and crooks are willing to call the name of religion and the name of Christ into a jury to make you believe that somehow they're pious and good people. They are not.

At no point during Everest's closing argument did the Defendants object or request an instruction to disregard Everest's counsel's comments or argument. Instead, they moved for a new trial, arguing only postjudgment that the jury arguments were incurable.

## B. Applicable law

Control of counsel's conduct during jury argument rests in the trial court's sound discretion. *Wells v. HCA Health Servs. of Tex., Inc.*, 806 S.W.2d 850, 854 (Tex. App.—Fort Worth 1990, writ denied); *see* Tex. R. Civ. P. 269. The test for improper jury argument is whether the argument could have persuaded a juror of ordinary intelligence to agree to a verdict contrary to that to which he would have agreed but for the argument. *See Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). Reasonable inferences and deductions from the evidence are allowed in closing argument, as is hyperbole. *In re I.C.*, No. 02-15-00300-CV, 2016 WL 1394539, at *18 (Tex. App.—Fort Worth Apr. 28, 2016, no pet.) (per curiam) (mem. op.). Reversal is required only when the entire record shows that (1) the argument was improper, uninvited, unprovoked, and incurable by instruction, withdrawal, or trial-court reprimand and

---

Jennings's son further testified that he agreed with Jennings's written statement that "[d]ue to [Grisel's] gross misrepresentations and fraudulent behavior, I lost the business that I built over the past 43 years of my business career."

(2) the complaint about the argument was preserved. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979). Further, an appellant must show that the argument constituted harmful error by its nature, degree, and extent. *Id.* The party seeking reversal based on an allegedly improper argument must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence. *Id.* at 840.

Ordinarily, a complaint regarding improper jury argument must be preserved by a timely objection that is overruled. *Living Ctrs. of Tex., Inc. v. Peñalver*, 256 S.W.3d 678, 680 (Tex. 2008). But in rare cases, an improper jury argument is considered incurable, and a contemporaneous trial objection is not required; a party may preserve the argument for appeal by raising it in a motion for new trial. *See id.*; *see also* Tex. R. Civ. P. 324(b)(5); *Gen. Motors Corp. v. Iracheta*, 161 S.W.3d 462, 472 (Tex. 2005) (holding that plaintiff's personally addressing the all-Hispanic jury in Spanish during her lawyer's closing argument to thank the jurors on behalf of her deceased daughter and deceased grandchildren was error that could not be repaired and therefore did not need to be objected to).

## C. Analysis

Because the Defendants did not object, they must show that Everest's jury argument was incurable. *See PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 721 (Tex. App.—Dallas 2011, pet. denied). Incurable jury argument occurs when comments are so inflammatory that an instruction to disregard cannot cure their

52

harmful nature. *Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 862 (Tex. App.—Fort Worth 2003, pet. denied). The test for incurability is whether the argument strikes at a court's impartiality, equality, and fairness and, if not corrected, inflicts damage beyond the parties and the individual case under consideration. *Peñalver*, 256 S.W.3d at 681. Examples of incurable jury arguments include appeals to racial prejudice, extreme unsupported personal attacks on parties or witnesses, and unfounded accusations of manipulating a witness. *See id.*; *PopCap Games*, 350 S.W.3d at 721; *see also Cottman Transmission Sys., L.L.C. v. FVLR Enters., L.L.C.*, 295 S.W.3d 372, 380 (Tex. App.—Dallas 2009, pet. denied) (recognizing that incurable argument can include unsupported charges of perjury and inflammatory epithets such as "liar," "fraud," and "cheat"). *But see Clark v. Bres*, 217 S.W.3d 501, 510 (Tex. App.—Houston [14th Dist.] 2006, pets. denied) (concluding that jury argument referring to party "as a liar, a cheat, a thief, and a fraud was not error or improper because the argument discussed matters in evidence").

But incurable jury argument is rare. *Peñalver*, 256 S.W.3d at 681. As the parties claiming incurable harm, the Defendants must show that, based on the record as a whole, the offensive arguments could have persuaded a juror of ordinary intelligence to agree to a verdict contrary to that to which he would have agreed but for the argument. *See Phillips*, 288 S.W.3d at 883. Here, Everest's statements are reasonable inferences and deductions from the evidence, *see I.C.*, 2016 WL 1394539, at *18; *Clark*, 217 S.W.3d at 510, and, although personal attacks on the parties, are supported

53

by the evidence, *see Peñalver*, 256 S.W.3d at 681. We thus cannot say, after viewing the entire record, that those arguments could have persuaded a juror of ordinary intelligence to agree to a verdict contrary to that to which he would have agreed but for the argument. *See Phillips*, 288 S.W.3d at 883. Accordingly, we overrule the Defendants' seventh issue.

## VI. Joint and Several Liability

The Defendants argue in their eighth issue that if we reverse the jury's conspiracy findings against Grisel and Morrison but not the fraud and negligent-misrepresentation findings against them, we should nevertheless reverse the judgment against them because Everest failed to secure a proportionate-responsibility finding. *See* Tex. Civ. Prac. & Rem Code Ann. §§ 33.002(a)(1), .013(b)(1). But because we have concluded that the evidence is sufficient to support the conspiracy findings against Grisel and Morrison, we need not address the Defendants' eighth issue. *See* Tex. R. App. P. 47.1.

## VII. Conclusion

Having sustained the Defendants' fifth issue as to the jury's conspiracy findings against Barreras and Cyndex because the evidence is legally insufficient to support those findings, we reverse the trial court's judgment as to Barreras and Cyndex and order that Everest take nothing against them. Having overruled the Defendants' dispositive issues, we affirm the rest of the trial court's judgment.

54

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  March 10, 2022